Filed 4/23/13  P. v. Anguiano CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESUS NABARETTE ANGUIANO,<br><br>    Defendant and Appellant. | F062011<br><br>(Tulare Super. Ct. No. VCF233282)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Darryl B. Ferguson, Judge.

Victor Blumenkrantz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant/defendant Jesus Nabarette Anguiano stabbed Benny Gallegos in the back of the head and neck while Gallegos was at a bar and dancing with defendant's

former girlfriend. Gallegos survived the assault. The bar's security cameras depicted defendant's conduct immediately before and during the stabbing. At trial, a prosecution expert testified that defendant committed the offense for the benefit of the Norteno gang because he was an active member of the gang, defendant was at the bar with other members of the Norteno gang, Gallegos was a member of a Sureno gang, and the bar's security videotape depicted defendant and other Nortenos watching Gallegos just before the stabbing.

Defendant testified and admitted that he stabbed Gallegos, but claimed he did not intend to kill him, he was not a member of the Norteno gang, and he did not commit the offense to benefit a gang. Defendant testified that he attacked Gallegos because he was angry that Gallegos was dancing with defendant's former girlfriend.

After a lengthy jury trial, defendant was convicted of attempted premeditated murder (Pen. Code,[1] §§ 664/187, subd. (a)), with special allegations that he personally used a deadly or dangerous weapon in the commission of the offense (§ 12022, subd. (b)(1)); he inflicted great bodily injury on the victim (§ 12022.7, subd. (a)); and he committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). Defendant admitted he suffered prior prison terms. He was sentenced to life with the possibility of parole, with the minimum parole eligibility date set at 15 years pursuant to section 186.22, subdivision (b). The court also imposed consecutive terms of three years for the great bodily injury enhancement, one year for the dangerous weapon enhancement, and one year for the prior prison term enhancement.

On appeal, defendant raises several issues based on a conflict that developed between his retained defense attorney and his retained defense gang expert. As the prosecution was presenting its case, defense counsel advised the court that his gang expert had just quit the defense case and would not testify. Defendant immediately

_____

[1] All further citations are to the Penal Code unless otherwise indicated.

2.

moved for a mistrial because he could not continue without an expert. The court denied the motion and held that defendant could file a motion for new trial if he was convicted and the gang enhancement was found true. After the verdict, defendant filed a motion for new trial and argued that his constitutional rights to due process and a fair trial were violated because the court should have granted his motion for mistrial when the defense gang expert quit. The court denied the motion and found that defendant was not prejudiced from the absence of a defense gang expert because it was evident from the bar's security videotape that the attempted murder was gang-related.

Defendant contends the court should have granted his motion for new trial because his constitutional rights to effective assistance of counsel, due process, and a fair trial were violated; the court should have granted his motion for mistrial when the defense gang expert quit; he suffered prejudice because the jury only heard testimony from the prosecution's gang expert that the stabbing constituted an attempted murder committed for the benefit of a gang; and the jury never heard contrary evidence on the disputed issues of whether the offense was attempted voluntary manslaughter committed in the heat of passion, and that it was not committed for the benefit of a gang.

Defendant also contends the court failed to investigate whether a juror was sleeping during trial, the court improperly allowed the prosecution's gang expert to offer speculative testimony about the conduct of defendant and other people depicted on the bar's surveillance videotape; the court did not correctly instruct the jury on the gang enhancement; and the prosecutor committed misconduct during closing argument. We will affirm.

## FACTS

Around 10:00 p.m. on Wednesday, January 13, 2010, Benny Gallegos went to the Sports Zone Pizza and Grill in Visalia to meet Deliliah Echavarria. At that time, Gallegos's head was shaved so that several tattoos were visible. He had a "CA" tattoo on top of his head, which meant "California." A tattoo on the side of his head said "My

3.

Crazy Life." A tattoo of "SD" was below his left ear. Gallegos testified the "SD" tattoo stood for the San Diego Padres and Chargers, and he was a fan of both teams, which had blue uniforms.

Gallegos testified he also had a tattoo on the back of his head which said: "BPM." It meant "Brown Pride Mexican," which was his "hood" in Corcoran, Kings County. Gallegos testified that "BPM" was an independent gang and it was not allied with the Nortenos or Surenos.[2] However, Gallegos admitted that he played Sureno gang music in his car, and he had previously been called a "scrap," a derogatory word for Surenos.

Gallegos testified he was wearing khaki pants, and a white and black striped shirt when he entered the bar that night. Gallegos admitted that he had a black bandana hanging out of his back pocket. A security guard asked him to put it away. Gallegos folded the bandana and put it in his pocket. Gallegos testified his bandana was black, it was not blue, and he was not showing any gang colors that night.

**Gallegos's conduct in the bar**

Shon Kekauoha was a security guard and bouncer at the Sports Zone. Kekauoha testified that the bar's patrons were usually "people who we thought to be more or less gang affiliated. They would come in large numbers; predominately red shirts, red jerseys, red hats. It was more or less unofficially known as a Norteno bar or Norteno spot, really." The bar had a dress code to "keep down any gang presence there as far as clothing articles." The bar did not allow patrons to wear bandanas because of possible gang affiliations. Kekauoha and the other bouncers often had to kick out self-admitted Norteno patrons who got into gang disputes with other bar patrons who represented where they were from.

---

[2] As we will discuss, *post*, the prosecution's gang expert testified that Brown Pride Mexican was a Sureno gang.

Kekauoha testified that when Gallegos arrived at the bar, he was showing a blue bandana out of his back pocket. Kekauoha was positive that Gallegos's bandana was blue and not black. Kekauoha also saw Gallegos's tattoos. Kekauoha told Gallegos that the bandana was not allowed and to either put it entirely in his pocket or take it back to his car. Gallegos put it in his pocket and entered the bar with his girlfriend.

Kekauoha testified that once Gallegos was inside the bar, he pulled the blue bandana out of his pocket and displayed it. Kekauoha again told Gallegos to put away the bandana, and Gallegos complied. Later in the evening, Kekauoha saw Gallegos dancing while the blue bandana was wrapped around his knuckles. Another security guard told Gallegos to put the bandana away.

Kekauoha testified that despite the admonishments about the bandana, Gallegos appeared to be "minding his own business" while he danced with his girlfriend.

Gallegos testified he did not have any conflicts with anyone in the bar. He did not notice any Norteno gang members in the bar; he did not see anyone throwing gang signs; and he did not hear any gang slurs. However, Gallegos admitted that at one point, he "threw up a dub" sign for "W," representing "West Coast," but he did not direct the sign at anyone.

**The stabbing**

Gallegos testified he was having a drink when he suddenly felt "some sharp pains" in the back of his head. He raised his hand to the back of his head and felt pain in his hand. He looked at his hand and saw "a whole bunch of blood was coming out." He realized he had been stabbed, but he had not seen the assailant because the person came from behind him.

Nathan Mendoza was another patron at the bar that night. He did not know Gallegos, but he saw the tattoos on the back of Gallegos's head and thought Gallegos was connected to a gang. Mendoza testified that he saw a man "creep up" behind Gallegos,

and "the guy just struck" Gallegos twice in the back of his head.  Mendoza testified the suspect was holding a small, sharp object in his hand.

Kekauoha testified that he felt some tension in the bar that night, but there were no fights or assaults.  He suddenly saw an unknown male rush behind Gallegos on the dance floor.  The assailant raised his arm and "came down the back of [Gallegos's] head."  Gallegos's head jerked forward, and the assailant retracted the blade from Gallegos's head and then ran out of the bar.  Gallegos was very disoriented and bleeding from the head.

Kekauoha decided not to immediately stop the suspect because he believed the man still had a knife.  Once the suspect left the bar, Kekauoha chased him from a distance.  The suspect ran away by himself.  After chasing him for a few blocks, Kekauoha broke off the pursuit because he was concerned the man might have a firearm.

**The initial investigation**

Around 11:00 p.m., police officers responded to the bar.  Officer Richard Cressall found Gallegos lying on the ground in front of the bar.  Several patrons and staff members were trying to help him.  Gallegos was taken to the hospital.[3]

Officer Cressall also found Deliliah Echavarria outside the bar, and then drove her to the hospital where Gallegos had been taken.  Echavarria told Cressall that "she was with her boyfriend [Gallegos] inside the bar when a group of Hispanic males came up behind him, and one of them with an unknown type instrument stabbed him approximately three to four times in the back of the neck."  Echavarria initially said that she did not recognize the suspect.

Officer Cressall testified that Echavarria said the suspect's name was "Jesse," and she recognized him from a previous confrontation at the "Blitz" bar, when the man

---

[3] Gallegos was in the hospital for two or three days and returned to work within one week.  He suffered at least two scars on the back of his head and a scar on his right hand.  At the time of trial, he still had sharp pains in the back of his head.

6.

brandished a weapon at her.[4] Echavarria said that about one week later, she was at "Wal-Mart" and saw "Jesse" as he was "driving around the parking lot," and said he gave her "menacing looks."

**Identification of defendant**

The police did not identify a suspect until Detective Luma Fahoum reviewed the bar's security videotape, which depicted the activities of various patrons before, during, and after the stabbing. Fahoum, who previously worked in the gang suppression unit, recognized defendant as the man who stabbed Gallegos. Fahoum knew defendant from prior contacts.

Fahoum testified that the videotape showed defendant had been in the bar with a group of people. Defendant was the only person who walked toward the victim, had an altercation with the victim, and then ran out of the bar.

On January 20, 2010, Detective Lampe showed Shon Kekauoha a photographic lineup which contained defendant's "mug shot." Kekauoha could not identify anyone as the suspect. Kekauoha said he had actually "carded" the suspect at the door when he entered the bar that night and had seen his photo identification.

Later that same day, Detective Lampe prepared another photographic lineup which contained defendant's picture from his driver's license. Kekauoha looked at the second photographic lineup, and identified defendant as the person who stabbed Gallegos.

**Echavarria's statement**

On January 25, 2010, Detective Lampe interviewed Deliliah Echavarria after she had repeatedly refused to speak to the police or return their telephone calls. She was staying at a motel in Visalia under a false name. Echavarria said she used the alias

---

**4** Officer Cressall later determined that a police report had been filed about the incident at the "Blitz" bar, but there was no mention about a weapon being brandished at Echavarria.

because she was afraid that defendant would find her.  Echavarria seemed hesitant and nervous about giving a statement to the police, but she was not under the influence of drugs or alcohol.

Echavarria said she had been dating Gallegos since the prior year, and she went out exclusively with him.  Echavarria identified defendant from the photographic lineup as the man who stabbed Gallegos.  Echavarria said she knew defendant from prior incidents at the Blitz bar and "Walgreens."  During the Blitz bar incident, defendant swore at her and pulled something from his waistband, which she believed was a gun.

Detective Lampe asked Echavarria if she was in a gang.  She said no.  He asked if Gallegos was in a gang.  She replied that he would have to talk to Gallegos himself.

**Echavarria's trial testimony**

At trial, Deliliah Echavarria testified as a reluctant prosecution witness.[5]  She initially testified that she had never been to Sports Zone; she was not present when Gallegos was stabbed; she did not know defendant; she never talked to the police about the stabbing; she never accused defendant of bothering her before the stabbing; and she never said defendant stabbed Gallegos.  Echavarria testified she could not remember anything because she was "always high."

On further examination, Echavarria eventually admitted that she knew Gallegos, and she was dating him at the time of the stabbing.[6]  She also admitted that she was with Gallegos when he was stabbed, but still insisted that she did not know where it happened because she was drunk and high that night.

---

[5] Echavarria had been subpoenaed by the prosecution, she failed to appear, and she was taken into custody just before her trial testimony.

[6] Echavarria had tattoos of three stars around her right eye, and more stars on her neck.  She also had "Lucky" tattooed on her neck.  She claimed that she did not know Gallegos's nickname was "Lucky," and she just happened to get that tattoo before she met him.

Echavarria also testified that she knew defendant before she knew Gallegos, and that she previously went out with defendant. Echavarria claimed her previous statements about defendant were false because she did not like defendant. Echavarria testified that she did not know if defendant was in a gang, he never brandished a weapon at her at the Blitz bar, and he never "maddogged" her at "Walgreens" or any other place. Echavarria testified she never identified defendant in a lineup or saw defendant do anything to Gallegos.

**Kekauoha's trial testimony**

At trial, Kekauoha watched the bar's security videotape and testified that it showed that the suspect entered the bar with a person in a white hooded sweatshirt. The suspect was wearing a black shirt. The suspect and his companion walked toward a group of males. They stood and spoke with them. The suspect walked through the crowd to the dance floor. The suspect appeared to reach into his right pocket. The suspect stepped behind Gallegos, while Gallegos faced the opposite direction. The suspect stabbed Gallegos in the back of the head, and then he ran out of the bar. Kekauoha testified that after reviewing the videotape, he was positive that defendant was the person who stabbed Gallegos.

**Evidence about other Nortenos in the bar**

The officers determined that the patrons at the bar that night included Mike Ruiz, Feliz Ruiz, and Alex Cervantez, who were sitting together at a table when the officers arrived to investigate the stabbing; Gilbert Salazar; and Tommy Madrid.

Detective Fahoum testified that based on her prior experience with the gang unit, Mike Ruiz was a Norteno and the brother of Felix Ruiz, who was a high ranking northern gang member in Tulare County. Tommy Madrid was a northern gang member with some "stature." Alex Cervantez was also a northerner.

**Evidence about defendant's possible gang affiliation**

Detective Fahoum testified she knew defendant and his brother from her prior experience in the gang unit. On April 13, 2007, Fahoum participated in a search of defendant's home and seized two firearms from his closet. Fahoum testified that she did not find any gang indicia in defendant's room during the search. When Fahoum found the guns, defendant said he had them because "gang tensions were high" in his neighborhood "on the north side of town." Defendant lived in a predominately northern gang area, but there were also some Asian and southern gangs which conflicted with northerners. Detective Fahoum had never encountered defendant with any gang indicia during her prior contacts with him.

Detective Lampe testified that he booked defendant into jail in connection with this case and asked defendant if he was affiliated with any gang for housing and safety purposes. Defendant initially said, " 'General population is fine.' " Lampe told defendant that he did not want him to be hurt and asked if he "might feel more comfortable being housed with a particular group" for his own safety. Lampe may have asked defendant if he wanted to be " 'housed north or south?' " In response, defendant said that he "hangs around with the northerners. He would prefer to be put with them." Defendant never acknowledged membership with a northern gang.

## THE PROSECUTION'S GANG EXPERT

Visalia Police Officer Michael Carsten testified as an expert on the Norteno gang, which had over 300 members and was the predominant criminal street gang in Tulare County. The Nortenos are associated with the Nuestro Familia prison gang and claim the color red and the number 14. The Surenos are rivals and enemies of the Nortenos. The Surenos are associated with the Mexican Mafia prison gang and claim the color blue and the number 13.

Officer Carsten testified that tattoos which are common among Nortenos include city names or area codes and stars which represent "the northern star." A five-pointed

10.

star "typically symbolizes" a completed mission for the gang. Norteno gang members in Tulare County have also adopted the logo for the Minnesota Twins, which consists of overlapping letters of "T and C." Carsten had seen Norteno gang members wearing belt buckles with the letter "N"; apparel from the Nebraska Cornhuskers, consisting of a red letter "N"; and red apparel from the Cincinnati Reds.

Officer Carsten acknowledged that members of the Norteno gang were not wearing red in Tulare County as frequently as before. Carsten explained that Nortenos and other gang members have learned from their experiences in the court system to downplay their gang affiliations when talking to the police about their association with other gang members, the significance of their clothing and tattoos, and when asked about their affiliations while being booked.

**Primary activities/predicate offenses**

Officer Carsten testified the primary activities of the Norteno street gang in Tulare County included robbery, carjacking, murder, attempted murder, auto theft, burglary, shooting at inhabited dwellings, witness intimidation, and drug transactions. Carsten had personally investigated vandalisms, robberies, burglaries, carjackings, witness intimation incidents, and auto thefts involving Nortenos.

Officer Carsten explained that one way to get into the Norteno gang was to put in "work" for it, by committing a violent crime or a series of crimes at the gang's direction. A gang member would gain respect and credibility, and rise within the gang, by committing crimes or missions for it, which included attacking or killing a rival gang member, particularly in front of witnesses. A Norteno did not need permission from a higher ranking gang member to kill a Sureno.

Officer Carsten testified about two predicate offenses committed by members of the Norteno gang in Tulare County, but which did not involve defendant. In December 2008, Isaac Sanchez and Daniel Quintano, active members of the Norteno gang, were convicted of armed robbery, with personal use of a firearm and the gang enhancement.

11.

The convictions were based on an incident when they confronted a victim and asked if he " 'bang[ed].' " The victim said no, and they robbed him at gunpoint. In May 2007, Richard Contreras and Javier Solis, active members of the Norteno gang, were convicted of, respectfully, second degree murder and voluntary manslaughter, with knife and gang enhancements. The convictions were based on an incident where Contreras and Solis confronted two victims and challenged them for being on their block, attacked them with knives, killed one victim, and injured the another person.[7]

**Defendant's gang status**

Officer Carsten testified to his opinion that defendant, also known as "Chewy," was a validated member of the Norteno gang, based on previous contacts with defendant, inmate classification forms, and his tattoos.

Carsten testified that on April 23, 2000, defendant and three other Nortenos assaulted a person because that person was not in their gang. On June 13, 2003, the mother of a Sureno gang member reported that someone was following her car. Defendant was subsequently identified as the person who followed her. When defendant was contacted, he was wearing a belt buckle with the letter "N" on it. Carsten conceded that defendant's middle name was "Navarrete."[8]

Officer Carsten was also aware of the incident in April 2007, when Detective Fahoum searched defendant's house and found two guns, a grenade, and ammunition. Defendant said he had the firearms for protection because of gang tensions in the neighborhood. Carsten thought defendant's reason was significant because "[a] person who has a problem with rival gangs is going to need to arm themselves for protection."

---

[7] In issue VII, *post*, we will address defendant's contentions that the prosecutor committed misconduct during closing argument because he allegedly referred to facts not in evidence about the Solis/Contreras homicide.

[8] While appellant/defendant's middle name is spelled "Nabarette" throughout the record, it is noted that it alternatively appears as "Navarette" here.

12.

On cross-examination, Carsten conceded that there were quite a few people who lived in the north side who had guns to protect themselves in the neighborhood, and not every person was a gang member.

On February 19, 2010, defendant was contacted by police while driving his vehicle with Anthony Cortez, a validated Norteno, and two Norteno associates. The traffic stop was conducted because defendant's car was described as a vehicle involved in an incident where a passenger brandished a gun. When the car was stopped, the officers found that Cortez had a gun in his shoe. Defendant denied being a gang member, and denied any knowledge of the gun.

Officer Carsten also testified about the information which defendant had previously given on inmate classification forms during the booking process. In January 2002, defendant indicated his enemies were "southerners." In May 2006, defendant indicated he did not associate with any criminal street gangs. In July 2007, defendant again stated that he did not associate with any criminal street gangs, but identified "southerners" as enemies for his own safety. In October 2007, defendant indicated he associated with "northern prison or street gangs."

Officer Carsten testified that on January 28, 2010, when defendant was booked into jail on this case, he denied any association with a street gang and asked to be placed in general population. The booking officer asked defendant whether his safety would be in jeopardy if he was placed with southerners. Defendant replied: " 'Okay. Well, put me with northerners.' "

Officer Carsten testified that defendant had a tattoo of a "five-pointed star" on his neck, with a picture of the state of California on top of it, which indicated that he was a Norteno from California. He also had tattoos of "Tulare," "County," and "TC," in black and red ink, on his right arm. The "TC" tattoo was similar to the Minnesota Twins symbol, which has been adopted by Norteno gang members.

13.

Officer Carsten conceded that he did not know whether defendant had served time in prison.[9] Carsten testified that he was not aware that defendant had any prior convictions for gang-related offenses.

Officer Carsten also conceded that defendant was not wearing red clothing on the night of the stabbing. There was no evidence that he had previously been seen in red clothing, or that gang paraphernalia had ever been found at defendant's house. Defendant did not have any tattoos which signified "14" or the Huelga bird.

**Gallegos's gang status**

Officer Carsten testified to his opinion that Benny "Lucky" Gallegos was an active member of the Sureno gang, based on Gallegos's tattoos and prior admissions. On January 24, 2010, after the stabbing, Gallegos told an officer that he was an active BPM Sureno gang member from Corcoran. Carsten testified that he spoke to a former Corcoran police officer who identified BPM as a Sureno gang. He did not know the basis for that officer's opinion about BPM's affiliation.

Officer Carsten admitted that Gallegos claimed that he had left the gang life behind him. On December 21, 2008, Gallegos was a victim of a gang offense, and said he used to be a Sureno. On the night of the stabbing, Gallegos told an officer that he was an inactive Sureno.

However, Officer Carsten testified that Gallegos showed a blue bandana in the bar, and he had Sureno tattoos. Carsten further testified that Gallegos's claimed affinity for San Diego teams, and his "SD" tattoo, represented the Sureno gang territory of Southern California.

---

[9] Defendant testified at trial and admitted he had served time in prison.

14.

**Deliliah Echavarria's gang status**

Officer Carsten was aware of Deliliah Echavarria's tattoos, including three stars on her neck, but he did not know if she was a Surena. He testified that it was "[n]ot absolutely unheard of" for a Surena to date a Norteno.

**Officer Carsten's testimony about the videotape**

At trial, Officer Carsten narrated the bar's security videotape as it was played for the jury, and identified several people with whom defendant associated before the stabbing. Carsten testified to his opinion that the videotape showed that defendant arrived at the bar with Tommy Madrid. Defendant was wearing a black T-shirt and Madrid was in a white hooded sweatshirt.[10] Madrid was a Norteno of "some stature" because he had served prison time. He also had a "VISA" tattoo on the back of his head, which meant North Side Visalia.[11]

Officer Carsten testified the videotape also showed that Mike Ruiz, Felix Ruiz, and Alex Cervantez were at the bar that night. Detective Fahoum testified Mike Ruiz was a Norteno; Felix Ruiz, his brother, was a high ranking northern gang member in Tulare County; and Alex Cervantez was also a northerner.

Officer Carsten testified that Shon Kekauoha, the security guard, stated that there was a group of people in the bar that he believed to be northern gang members, and the victim had possessed a blue bandana. Nathan Mendoza, a bar patron, said the victim showed off that he was a southern gang member.

Officer Carsten testified videotape showed that defendant and Tommy Madrid stood together at the bar while Madrid spoke to Alex Cervantez. Gilbert Salazar and

---

[10] On the night of the stabbing, Allen Adney, another security guard at the bar, told an officer that the stabbing suspect had entered the bar with a man in a white T-shirt.

[11] Carsten acknowledged the colors of black, white, and grey are generally neutral among the gangs.

15.

Alex Cervantez were at the same table and talking with each other. Defendant shook hands with Mike Ruiz as Salazar stood next to them.

Officer Carsten noted that according to a police report, Mike Ruiz said he was at the bar with Cervantes, but he denied knowing Madrid, and he claimed he never spoke to anyone else that night. Carsten testified the videotape refuted Mike Ruiz's claims because it showed Ruiz and Madrid "in close proximity" and engaged in "what appears to be a conversation between the two of them." The videotape also showed Cervantez talking to defendant, Salazar, Mike Ruiz, and Madrid. Cervantez was standing just a few feet away from Gallegos, and he was facing the direction where the stabbing later occurred.[12] The videotape showed Cervantez talking to the man in the red shirt, identified as "Bro."

Officer Carsten testified that Gilbert Salazar later told an officer that "the person he knew as Bro told him there was going to be an attack on a scrap at the bar. His indication was that he did not want to be part of that attack. He also indicated he was a Norteno gang member and said that he was not active at the time." "Bro" was described as "a male adult wearing a red shirt." Carsten testified that Salazar's statement was important because it showed that more than one person knew there was going to be an attack.

Officer Carsten testified about the conduct of "posting up," which meant "standing watch. Guarding." Carsten testified to his belief that videotape showed the man in the red shirt, who was standing next to Cervantez and Madrid, was looking in the general direction of the area where Gallegos was. Carsten believed the man in the red shirt was

---

[12] The court overruled defendant's objections to Carsten's testimony on these points. In issue IV, *post*, we will address defendant's contentions that the court erroneously overruled his objections to Carsten's testimony and interpretation of the videotape.

16.

discussing something with Madrid. At the same time, Cervantez and Salazar were looking in the opposition direction.

Officer Carsten testified to his opinion that the assault on Gallegos was a coordinated attack, based on his review of the security videotape.

> "In viewing the video, the persons that I've identified as Mike Ruiz, Alex Cervantez, [defendant], Tommy Madrid, and Gilbert Salazar, in watching those persons and Mr. Gallegos in the video, when Mr. Gallegos walks into the bar, he is noticed by or appears to be noticed by Mike Ruiz. And Mike Ruiz goes out of his way to keep an eye on Mr. Gallegos as he walks through the bar. And then there appears to be some sort of communication between Ruiz and the others. And they're back and forth. There is communication between Ruiz and Madrid and Madrid and [defendant], also including Salazar and this other person we know as Bro in the red shirt. Also Alex Cervantez. There is communication between all of them leading up to the incident."[13]

Officer Carsten testified that based on his review of the security videotape, it was his opinion that defendant discussed the assault with Gilbert Salazar. Carsten conceded that he could not be sure about the conversation because there was no sound on the tape. Carsten also conceded that he did not have any information that defendant previously knew the Ruiz brothers, Madrid, or Cervantes prior to the night of the stabbing.

Officer Carsten testified that the videotape showed that the man in the red shirt appeared to walk to the dance floor and move closer to Gallegos. Cervantes appeared to be facing Gallegos's "general direction." Carsten testified that defendant was standing next to Madrid, and they appeared to be discussing something.

Officer Carsten testified the videotape showed that defendant walked to the dance floor, followed by Salazar. Salazar stood next to Cervantes. Defendant reached into his

---

[13] Defense counsel objected to Carsten's opinion testimony on this point; the court overruled the objection.

17.

pocket and walked up to Gallegos. Defendant's hand went up and down toward Gallegos's head as he stabbed him.

Officer Carsten testified the videotape showed that Tommy Madrid moved to a different location in the bar, away from the location of the assault, when defendant stabbed Gallegos. Carsten testified it was "tough to say what exactly he could see from that vantage point from the video, but it does appear that there is a surrounding-type of the victim."[14]

On cross-examination, Officer Carsten testified that he did not have any evidence that defendant bragged about the stabbing of Gallegos. Carsten also conceded that there was no evidence as to exactly what defendant and the other men were talking about when they were seen together on the videotape, and no witnesses overheard their conversation.

Officer Carsten testified to his opinion that defendant's attack on Gallegos, as depicted in the video, could have gotten him into the Norteno gang based on his commission of that crime.[15] Carsten conceded there was no evidence whether defendant or his associates knew Gallegos, whether Gallegos was affiliated with a gang, or they saw Gallegos with the bandana. However, defendant would not have to know that Gallegos was a Sureno if he had been directed to perform the assault by another gang member. Carsten conceded that he did not have any evidence that defendant received direction from anyone to attack Gallegos, but believed the videotape showed some nonverbal communications.

> "When Mr. Gallegos enters the bar, Mike Ruiz pays very close attention to that. As a matter of fact, he watches him very closely as he enters the bar. And then throughout the course of the video, you can see as the male in the red shirt known as Bro is standing in close proximity with Mr. Gallegos, as is Mr. Cervantez, as is Gilbert Salazar."

---

[14] The court overruled defendant's objection to this question.

[15] The court overruled defendant's objection to this question.

Officer Carsten believed that Mike Ruiz's actions showed him doing "more than just looking at somebody," and that he "followed" Gallegos and watched him "very closely," although Ruiz did not gesture or point at Gallegos.

Officer Carsten conceded that he did not know whether any of these actions were communicated to defendant, or what defendant discussed with Ruiz, Salazar, and/or Madrid. In his expert opinion, however, he believed the videotape showed that defendant, Mike Ruiz, Salazar, and Tommy Madrid were looking at Gallegos and talking about him.

Officer Carsten conceded that the videotape did not show Gallegos flashing the bandana at any time. However, both Shon Kekauoha and Nathan Mendoza stated that they saw Gallegos flashing the bandana inside the bar.

**Hypothetical questions**

The prosecutor asked Officer Carsten about the following hypothetical question:

"Let's say an individual goes into a place with another high ranking Norteno gang member, meets up with some other Nortenos in that bar, and other members of that group go back and forth posting up close to a Sureno gang member, and after these individuals go back and forth and communicate with each other, then the person that came into the establishment with that high ranking individual then goes over to that Sureno and stabs him in the neck four times with a blade-type instrument …."

Officer Carsten testified that in his opinion, the crime would have been committed for the benefit of the Norteno gang because "it is an attack against a rival gang member. It's a long time rivalry between Nortenos and Surenos. This is one more attack in an attempt to take out, disable, or at least injure a rival gang member." Carsten further testified the crime would have been committed in association with the Norteno gang based "on persons present with the assailant prior to the act occurring."

Officer Carsten testified the offense would further the Norteno gang because of "the rivalry between Nortenos and Surenos. It's a struggle for power. It's a show of

19.

dominance. It is a direct attack against the rival. It promotes the gang. It spreads fear into other people and let's them know that Norteno gangs and Sureno gang, one, are rivals, and, two, are willing to use deadly force when they attack one another." The offense also would have promoted the Norteno gang because Nortenos discuss and brag about their crimes with each other, and the assailant's status would be elevated within the gang. "That he's willing to attack a rival gang member in front of … a group of people, not caring about himself, but … caring more about attacking that gang member." There was "no question" about the significance of "a public display" of committing a crime in front of other gang members.

Officer Carsten was asked about a hypothetical situation involving a former girlfriend:

"Q. And in your expert opinion, what would be the reaction of a Norteno if he was to lose his girl to a Sureno?

"A. In my opinion, he'd be upset and he would want to exact some sort of revenge."[16]

Officer Carsten further explained that "[i]f that person was a rival gang member, that goes even farther to say that that person would need to be punished." The other gang members would react by standing up for their fellow gang member, if the girl was dating a rival gang member.

### Cross-examination; hypothetical questions

On cross-examination, defense counsel asked Officer Carsten whether a person would be a Norteno if that person went out and had "a couple beers with a guy that happens to be an old school chum" who was a Norteno. Carsten replied that the person would not be a Norteno without more information.

---

[16] The court overruled defense counsel's objection to Carsten's answer.

Defense counsel also posed a hypothetical question as to whether an assault would constitute a public display of violence to promote the gang:

"Q.    Well, person beats up another person on their own, how is that promoting the street gang?  Let me put some other factors involved.  The person has no gang attire on, the person has no readily apparent gang tattoos, uses no gang epithets, and says no – gives no indication as to what the motivation for the assault is, how is that for the benefit of a street gang?

"A.    That by itself with no other information, no previous history of that person, no associations with that person, I can't say that it is or it isn't."

Defense counsel asked about Echavarria's statements about her prior dating relationship with defendant.

"Q.    … *Isn't it just as possible that the motivation for this particular assault was jealousy based on the factors you have in front of you?*

"A.    *I won't say it's impossible, but that's not my opinion.*  [¶] … [¶]

"      "..................................................................................................

"Q.    And it's further substantiated as a possibility based on the lack of factors from [defendant]; no gang clothing, no gang epithets, no apparent gang motivation, is that correct?

"A.    No, I can't say that.  There is certainly gang association.  There is certainly gang-related tattoos.  There is certainly previous contacts with gang members.  That's what I use to formulate my opinion."  (Italics added.)

Officer Carsten further conceded that when defendant looked in a particular direction, he could not testify from the videotape whether he was looking at Gallegos or "the woman that he dated."

## DEFENDANT'S TRIAL TESTIMONY

Defendant's trial testimony was the only defense evidence presented.  Defendant denied being a member of any gang, but the Nortenos were the primary gang at every place he had lived.

21.

Defendant admitted that he had previously been to prison for possession of narcotics and firearms which were found in his house. He had the guns to protect his family and children because members of the Oriental Troops Asian gang lived near him and occasionally jumped his fence when running through the neighborhood.[17] Defendant denied having the guns because of any connection with the Nortenos, or to protect himself from Surenos.

Defendant admitted that the police stopped his car in February 2010, and that passenger Anthony Cortez had a gun. Defendant had been giving a ride to Lynette Barba when she asked defendant if Cortez and another man could also get a ride. Defendant explained that he did not know Cortez, that Cortez was a Norteno, or that he had a gun.

Defendant testified that his tattoos were not gang-related, and he did not have any Norteno or "14" tattoos. The "Tulare County" tattoo represented Tulare County, and the "TC" tattoo was for the Minnesota Twins. Defendant admitted he got the "TC" tattoo while he was in prison. Defendant claimed he was a fan of the Twins, and knew that Kirby Puckett had played for the farm club in Visalia. Defendant testified he designed the star and California tattoos on his neck, which meant "California porn star," as a joke among his girlfriends.

Defendant further testified he did not wear red clothing or hats, and did not have any apparel with the "TC" design. He usually wore dark colors like black and gray. His "N" belt buckle stood for his middle name. He denied that his nickname was "Chewy."

Defendant testified that he had never told any jail intake officers that he was a member of a gang. Defendant admitted that he would "hang out" with people who he felt comfortable with, and they might have been gang members. He denied doing anything to make Surenos angry at him. Defendant admitted that he had listed "southerners" as his

---

[17] In rebuttal, Officer Carsten testified the Oriental Troops claimed the color blue, and their rivals were the Nortenos and another Asian gang which claimed red.

22.

enemies in jail: "Well, I mean, if you run into them in jail, then what are you going to do? You're going to get hurt, right?" He thought that southerners would think that he was a Norteno because he socialized with them in high school.

**Defendant and Echavarria**

Defendant testified that he met Deliliah Echavarria when she worked as a stripper at a private party in August 2009. They started dating, and he thought they were in an exclusive relationship, although defendant was married to another woman.

Defendant testified they broke up because Echavarria was jealous that he had other girlfriends. Defendant testified that he saw Echavarria at the Blitz bar, when he was there with a couple of girlfriends. Echavarria became "a little hostile" toward him, and called the girls various names. The bar's bouncers threw her out. Defendant denied brandishing a weapon during that incident. Defendant testified he later saw Echavarria at Walgreens while he was with two other girlfriends. Echavarria "flipped [him] off" and was hostile toward the girls.

**The night of the stabbing**

Defendant testified that he worked for an almond warehouse and carried a box cutter for his work. On the day of the stabbing, he finished work and went to a friend's house. Defendant and his friend split a 12-pack of beer. Defendant left the friend's house and went to the Sports Zone bar by himself.

Defendant testified he did not enter the bar with Tommy Madrid. Defendant initially testified he did not know Tommy Madrid, but then admitted he knew him from high school. Defendant had worked as a bouncer at different bars, and also recognized Madrid from seeing him at those bars. Defendant testified he knew Madrid enough to say hello to him. Defendant knew Madrid used to hang around with gang members in high school, but he did not know if he was a gang member because they never talked about it.

Defendant testified he followed Madrid to the bar, where he shook hands with a couple of guys, shook hands with Madrid, and bought a beer for Madrid and a drink for

23.

himself.  Madrid introduced him to several people.  The music was very loud, and defendant did not hear their names or anything Madrid said about them.  Based on his prior experience working at other bars, defendant recognized Felix and Mike Ruiz, Alex Cervantez, and Gilbert Salazar, but he did not know their names and did not know if they were gang members.  Defendant, Madrid and the other men did not discuss Gallegos, or whether Gallegos had engaged in any type of gang-related activity.

**The stabbing**

Defendant testified that as soon as he entered the bar, he saw Echavarria dancing with a man, later identified as Gallegos.  Defendant testified that he felt upset, angry, and shocked.  Defendant did not know or recognize Gallegos; he did not see Gallegos holding a blue rag; he did not see any Sureno tattoos on Gallegos; and he did not know or care if he was a Sureno.

Defendant testified that while he was standing with Madrid, he kept looking at Echavarria.  He became upset about the way she was dancing with the other man, and that was "building up my anger.  That's the only thing that was on my mind was watching her dance on this other man."

Defendant testified he did not talk to Madrid or the other men to plan the assault on Gallegos.  However, defendant admitted that he told the other men that a man was " 'with my girl,' " and he was " 'going to kick his ass.' "  Defendant might have told the man in the red shirt the same thing.  Defendant admitted that the videotape showed him talking with Tommy Madrid just before the stabbing.  Defendant testified that he might have told Madrid that he was going to leave.

Defendant testified that he walked toward Echavarria and Gallegos.  He still had his box cutter from work, took it out of his pocket, and opened the six-inch blade.  "After seeing what she was doing, she was dancing on him, I just lost it."

Defendant testified that he walked behind Gallegos, "acted out," and stabbed Gallegos in the back of his head and neck.  He stabbed Gallegos because he felt too drunk

24.

to fight him, and he thought the stabbing was "the best way" to hurt him. Defendant testified he did not intend to kill Gallegos. "All I wanted to do was hurt him because she was hurting me, and I was mad." Defendant would have sliced Gallegos's throat if he had wanted to kill him. Defendant did not assault Echavarria because "I'm not going to touch a woman. I'm not going to put hands on a woman."

## Verdict

Defendant was convicted of attempted premeditated murder, with special allegations that he personally used a deadly or dangerous weapon in the commission of the offense; he inflicted great bodily injury on the victim, and he committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).

## PROCEDURAL HISTORY

As set forth above, Officer Carsten testified as the prosecution's gang expert. Defendant was the only defense witness, and the defense did not introduce any expert testimony to contradict Officer Carsten's testimony for the prosecution.

As we will explain, Victor Perez, defendant's retained attorney, had retained Michael Hurtado as a gang expert to testify for the defense. However, Hurtado resigned in the middle of trial because of an alleged dispute with defense counsel. Defense counsel moved for a mistrial. The court denied the motion and advised defendant to file a motion for new trial if he was convicted. After the verdicts, defendant filed a motion for new trial based on his inability to present any expert testimony to contradict Officer Carsten. The court denied the motion.

In issues I and II, we will address defendant's primary appellate contentions – that his constitutional rights to effective assistance of trial, due process, and a fair trial were violated when the court denied his motions for mistrial and new trial, and because the defense expert's resignation prevented defendant from presenting a defense to contradict the prosecution's expert testimony relative to the charged offense and the gang enhancement.

25.

As relevant to these issues, we must review the procedural history of this case which led up to the resignation of the defendant's gang expert, and the court's denial of defendant's motion for new trial.

**Defense counsel hires gang expert**

Defendant was represented by a retained attorney, Victor Perez, for the entirety of these proceedings. Perez hired Michael Hurtado as a defense expert witness on gangs. On August 31, 2010, after the information was filed, the court granted defense counsel's application to allow Hurtado to interview defendant in jail.

**Defendant's motions in limine about the defense expert**

In anticipation of Hurtado's trial testimony as the defense expert, defendant filed two motions in limine for the trial court to bar the prosecution from impeaching Hurtado's credibility based on two prior incidents in separate and unrelated cases.

The first motion was based on an incident which involved Hurtado's contact with a court reporter. According to defendant's motion, Hurtado contacted a court reporter in another gang case, and asked to obtain transcripts in that case as research on his dissertation.[18] A bailiff overheard the conversation and believed Hurtado had falsely represented himself as a newspaper reporter. However, the court reporter later signed a declaration that Hurtado accurately identified himself, he never claimed to be a newspaper reporter, and the bailiff misunderstood what happened. Nevertheless, the prosecution had attempted to use this incident to impeach Hurtado's testimony in another unrelated case. As relevant to this case, defendant asked the court to prevent the prosecution from impeaching Hurtado's testimony with this incident.

The second motion was based on an incident from an unrelated juvenile case, where Hurtado was called as an expert, but the court did not allow him to testify.

---

[18] According to Hurtado's curriculum vitae, he had a master's degree and was working toward a doctorate.

Defendant asserted there was no evidence as to why Hurtado was not allowed to testify as an expert in the juvenile case. As relevant to this case, defendant asked the court to prevent the prosecution from impeaching Hurtado's credibility with this incident.

**The court's rulings about Hurtado's expected testimony**

On Wednesday, December 8, 2010, defendant's trial began with motions in limine, and the court reviewed defendant's two motions to prevent impeachment of Hurtado with the two prior incidents.

The court stated that it would not allow the prosecution to impeach Hurtado with evidence from prior cases. However, it would require the defense to lay the foundation for Hurtado's expertise, and then it would decide whether Hurtado would be allowed to testify as the defense expert. The court believed Hurtado had previously testified before it.

The prosecutor requested a hearing pursuant to Evidence Code section 405 to determine Hurtado's qualifications as a gang expert. The prosecutor also complained that he had not received discovery as to Hurtado's expected opinion testimony. Defense counsel replied that Hurtado had not provided him with a written report.

The court ordered defense counsel to provide written discovery to the prosecution about Hurtado's expected opinion testimony. Defense counsel was not sure if Hurtado could provide a written report because he was "in finals," but he was "definitely going to be here."

The court declined to impose the discovery sanction of excluding Hurtado as the defense expert:

> "*I'm not going to deny the defense the opportunity to call this witness. I'd get reversed in a heartbeat if I did that.*" (Italics added.)

The court asked defense counsel about Hurtado's whereabouts. Defense counsel replied that Hurtado was "in Fresno in classes taking finals." The court ordered Hurtado to appear the following morning with a written report for discovery and to testify in a

27.

hearing about his expertise prior to appearing at trial. Defense counsel asked the court what would happen if Hurtado could not produce a written report by the following morning. The court replied that Hurtado could not sit in the courtroom and listen to trial testimony until a written report was disclosed.

After a brief recess, defense counsel stated that he had contacted Hurtado, who said he was scheduled to testify in Contra Costa County the following morning. Counsel stated that Hurtado had final examinations on the morning of Friday, December 10, but he could appear in court on Friday afternoon for the hearing on his expertise.

The court agreed to conduct the hearing on Hurtado's testimony on the afternoon of Friday, December 10. The court further held that the defense should have provided discovery of Hurtado's report 30 days before trial, that Hurtado could not listen to the trial testimony until he filed a written report, that defense counsel could not mention Hurtado's expected testimony in his opening statement "because I don't know if he's going to be allowed to testify," and the jury would be admonished about the late discovery. Thereafter, the court and the parties proceeded with jury selection.

**Discovery of Hurtado's written report**

On or about December 9, 2010, as jury was being selected, the prosecutor received discovery of Hurtado's written report about his proposed expert testimony.[19]

According to the report, Hurtado had been a paid gang expert for three years; he had testified in at least 75 gang cases in nine counties; and he had previously qualified as an expert in Tulare County. He had a master's degree and was in the process of finishing his doctorate in forensic psychology.

In the report, Hurtado summarized information about defendant's alleged contacts with the Norteno gang, based on the prosecution reports received during discovery.[20]

---

[19] Copies of Hurtado's report were attached as exhibits in both defendant's motion for new trial, and the prosecution's opposition to that motion.

28.

Hurtado's report offered the following conclusions, based on the same factual background later addressed by Officer Carsten at trial:

> "In my review of the discovery, [defendant] never admitted membership, and never admitted in a custodial facility that he was a gang member. However, [defendant] has admitted to association with gang members. His tattoos are also in question and are not proven to be gang related as the star is universal and Tulare County has not been proven to be Norteno, or Northern gang related. Lastly, [defendant's] current crime accusation has not been judged by a jury of his peers and should not be considered at this point in time."

Hurtado's report did not address the bar's security videotape, defendant's interaction with other alleged Norteno members at the bar, his conduct before, during, and after the stabbing, his prior relationship with Echavarria, or whether defendant stabbed Gallegos because he was at the bar with Echavarria.

**Hurtado's e-mail to defense counsel**

Also on December 9, 2010, Hurtado sent an e-mail to defense counsel. The substance of the message implies that it accompanied the discovery report.[21] In the e-mail, Hurtado addressed the prosecution's possible impeachment of his credibility with the court reporter and the unrelated juvenile case incidents, and the prosecution's demand for a hearing on the admissibility of his expert testimony in this case.

> "I have to remind you for the record. I am very upset with the way this turned out. I told you weeks ago about having to prepare for finals during these two weeks. You stated not to worry about it that you would work around it, however I feel like you are working around what the DA wants. I am extremely behind on my preparation .… Having to help you with this motion in limine (produced three times) because you either did not

---

[20] Hurtado's report summarized almost the identical information offered by Officer Carsten and other officers about defendant and his prior Norteno contacts, as testified to by the prosecution witnesses at trial.

[21] The prosecution included a copy of this e-mail in its opposition to defendant's motion for new trial. Defendant has not challenged its veracity.

understand the facts, or confusing the interpretation of the law or were not listening caused over a week of stress. I was confused because I did not want to let you down and help you and [defendant] with this case, and yet I should have just removed myself a week ago and consentrated [*sic*] on my finals. I don't understand why I have to get accused of bullshit by the DA, and yet this officer, after examination has made some foul accusations on his report. *[T]he DA can do these extra moves to throw me off the case, which has happened, I feel my time in what you allowed has taken my time from the case. And, yet no one holds these officers accountable for these bold accusations against citizens, mainly Latinos. I would expect you to hold them more accountable and not allow them to hold the cards and mess with my time.*

"At this point, I have completed my area of the agreement by *giving this awesome report that has dissected their case and gives you something to fight with. However, I am going to look into this Friday business [about the hearing] because I do not believe you took into account my needed interests, which as you will read in the report has been your client[']s best interests.* If I can't make it, and then the judge does not allow me to testify on this case, so be it. Once again, I have spent countless hours in the last week preparing for something you should have done last month." (Italics added.)

## Introduction of evidence

Later on December 9, 2010, the jury was impaneled in defendant's case and the prosecution began to introduce evidence. During the initial course of trial, defense counsel extensively cross-examined the witnesses as to whether they could identify defendant or anyone else as the person who stabbed Gallegos, and whether the bar's surveillance videotapes clearly depicted defendant as the suspect.

On December 10, 2010, Officer Carsten began his direct examination testimony as the prosecution's gang expert. The court did not conduct a hearing on the admissibility of Hurtado's proposed expert testimony, as previously scheduled for that day. According to the prosecution, the court rescheduled the hearing for Monday, December 13, 2010.

## Hurtado withdraws from defense case

On the morning of Monday, December 13, 2010, the court convened outside the jury's presence. Defense counsel advised the court that Hurtado, the defense expert, had

30.

resigned from the case. Counsel said he met with Hurtado on Saturday, December 11, 2010, and they "discussed what I felt needed to happen in the case. And he had a lot of concerns that he was voicing. [¶] Sunday we had two phone conversations; last one culminating with his resignation from the case."

Defense counsel advised the court:

> "I think it's pretty obvious that I don't believe my client can get a fair trial without the assistance of an expert in this matter. *I don't have any control over the conflict that had arisen between Mr. Hurtado and myself.* Those services that he was contracted to do he did. He was not as yet paid for the trial appearance. That money was in my trust. He has a lot of concerns that, frankly, there is no middle ground for." (Italics added.)

The court asked defense counsel whether Hurtado was under subpoena. Defense counsel said no because he never subpoenaed his own expert witnesses. Defense counsel continued:

> "I don't think my client can get a fair trial without the expert. So it's the conflict between him and I have that have caused my client to be in an inferior position at this point. Then, much as I would hate to say that, I think perhaps that's ineffective assistance of Counsel. But, certainly, I don't think my client can go forward and have a fair trial without his expert present."

The court brought the jurors into courtroom and excused them until the afternoon, when it would determine "whether or not we're going to go forward with this trial."

**The court's denial of defendant's motion for mistrial**

After a recess, the court reconvened outside the jury's presence. The court acknowledged the issue was how to proceed based on defense counsel's representation that "his expert and he have arrived at an impasse in this trial that makes it impossible for him to use his expert."

The court asked defense counsel whether they disagreed over trial tactics or the expert's ultimate opinion. Defense counsel replied:

"But there was a number – there were a number of points of contention where candidly my expert was not comfortable with the way that I was planning to handle certain aspects of the cross-examination and certain aspects of the evidence. And my position with him was I'm the attorney. I dictate how that's supposed to be handled. He felt differently about it and felt that he and I could no longer work on this case and told me that, literally, Sunday evening."

The court acknowledged that defense counsel claimed that if he was denied the opportunity to use a gang expert, then "that would amount to ineffective assistance of counsel." The court reviewed *Carrillo v. Superior Court* (2006) 145 Cal.App.4th 1511 (*Carrillo*), and stated that the case addressed whether a mistrial could be granted for ineffective assistance based on legal necessity. The court read a lengthy excerpt from *Carrillo* and stated that it was " 'an extremely rare event' " to grant a mistrial because of the perceived ineffectiveness of defense counsel, and that " 'a far safer practice' " was for the court to intervene " 'only in ruling on posttrial motions following a conviction, if indeed a conviction occurs. It is unwise for a judge to declare a mistrial due to counsel's alleged ineffectiveness because it's a chancy business to predict a verdict a jury may have returned in this case.' "[22]

After reviewing *Carrillo*, the court made the following findings.

"So far, the defense in this case has been 'I didn't do it. It wasn't me.' So far. 'No one can identify me.' There has [*sic*] been attacks on the video and the credibility of whether or not somebody actually can see the defendant do what he's charged with doing. So first off, he's claiming 'I didn't do it,' at least so far. And let alone that 'I'm not a gang member.' If they find you didn't do it, whether or not there's gang testimony or not, is irrelevant. It doesn't matter.

---

[22] As we will explain, *Carrillo* did not address whether a trial court should grant or deny a motion for mistrial based on ineffective assistance, but whether there were "extreme circumstances" in that particular case to support the trial court's decision to grant a mistrial and discharge the jury without the defendant's consent, which prevented a retrial in the absence of "legal necessity" for the mistrial. (*Carrillo*, *supra*, 145 Cal.App.4th at pp. 1527-1530.)

"And at this point in time, taking my guidance from the *Carrillo* court, I believe the better practice is to go forward with the trial and reach a verdict. If there is a verdict of guilty, then you can do a motion for new trial based upon the circumstances. But at this point in time, I don't believe that a mistrial or termination of these proceedings is appropriate."[23]

Defense counsel replied that his conflict with Hurtado only "came to light on Sunday well into the course of the trial." As a result of that conflict, defendant was "being deprived of the ability to say that his actions, if he testifies to his actions, were not for the benefit of or furtherance of a gang-related crime."

The court disagreed that there was a conflict between defense counsel and defendant.

"The conflict exists between you and your expert as to the tactics to be used during the trial. We're going to go forward with the trial. And if there is a conviction, if he's found – if the gang allegations are found to be true, then you can proceed with a new trial motion. We'll deal with that at that point in time. But if he's found guilty and the gang allegations are found not to be true, then the fact that this expert didn't testify is moot. It's irrelevant."[24]

## Continuance

The reporter's transcript is silent as to whether defense counsel asked for a continuance, or if the court offered to grant a continuance of any kind. Based on the entirety of the pleadings in this case, the parties agree that after the court denied the motion for mistrial, it offered a "short" continuance for the defense to secure a new gang expert. The parties also agree that defense counsel declined the short continuance because there would not be sufficient time to hire a new gang expert and for that person

---

[23] The court accurately summarized that defense counsel's cross-examination of the prosecution's witnesses up to that point focused on identity.

[24] It is unclear from the court's statements whether it would have considered a motion for new trial on this ground if defendant had only been convicted of attempted murder and the gang enhancement was not found true.

33.

to prepare.  The record is silent as to what the court and/or defense counsel considered a short continuance.[25]

## Resumption of trial

Later that day, the jury returned to the courtroom and the trial resumed with Officer Carsten's direct examination testimony.

On December 14, 2010, the prosecution rested.  Defendant testified as the only defense witness.  The prosecution recalled Officer Carsten for brief rebuttal, and then the court read the instructions to the jury.

On December 15, 2010, the jury heard closing arguments and began deliberations at 1:57 p.m.  At 4:20 p.m., the jury returned the verdicts and found defendant guilty of attempted premeditated murder and the gang enhancement true.

## Defendant's motion for new trial

On December 29, 2010, defendant filed a motion for new trial, based on the court's denial of his constitutional right to present a defense when it denied his motion for mistrial after his defense expert resigned.

Defendant's motion was prepared by Perez, his retained defense counsel, who filed an extensive declaration in support of the new trial motion.  Defense counsel explained that he retained Hurtado as an expert, Hurtado reviewed the gang-related discovery and interviewed defendant, and Hurtado prepared the written report that has been previously discussed.

Defense counsel further declared that Hurtado was upset that counsel failed to establish him as a qualified expert and that the prosecutor requested a hearing on the admissibility of his expert testimony.  Defense met with Hurtado on Saturday, December 11, 2010, and Hurtado never indicated that he was considering whether to quit the case.

---

[25] When a defense attorney does not request a continuance in the trial court, the defendant cannot be heard to complain on appeal that the trial court failed to grant a continuance on its own motion.  (*People v. Alcala* (1992) 4 Cal.4th 742, 782.)

On Sunday, December 12, 2010, however, Hurtado advised defense counsel that he had not "protected" Hurtado's interests, he was going to quit, and he would not testify for defendant.

In his motion for new trial, defendant argued that Hurtado's resignation placed defendant "in an untenable position" because he was left without the testimony of a gang expert to refute the gang allegations in the case, and there was insufficient time for him to retain another expert who could have been prepared to testify at trial. Defendant was forced to "press forward" and present "an incomplete defense," which "severely compromised" his defense to the gang allegations. "As a result, the jury was only presented with the opinion of the gang expert retained by the prosecution, an opinion that different dramatically from that given by the defendant's previously retained gang expert. This translated into the defendant being denied a fair and impartial trial."

As a separate ground for new trial, defendant also argued that his retained defense attorney, Perez, was prejudicially ineffective because he failed to request a continuance when the defense expert resigned. In the motion, Perez essentially argued his own ineffectiveness and conceded that while he moved for a mistrial, he failed to request a continuance for adequate time to retain another expert to testify, and that failure constituted ineffective assistance.[26]

In addition to defense counsel's declaration, the only supporting exhibit was Hurtado's report which had been prepared for discovery purposes on the eve of trial. Defendant did not file any other supporting declarations from Hurtado or another expert about how a gang expert might have testified in this case.

---

[26] The parties later agreed that the court offered defense counsel a "short continuance" to find a new expert, but defense counsel declined the offer because he did not believe he would have enough time to retain an expert who would be prepared to testify.

## The prosecution's opposition

On January 7, 2011, the prosecution filed opposition to defendant's new trial motion.[27] The prosecution argued that based on Hurtado's written report, prepared for the belated discovery order, his opinion was going to be "restricted to the sole issue of the defendant's gang status," and that Hurtado would testify that defendant "was not a norteno gang member," based on the discovery provided by Officer Carsten. The prosecution noted that Hurtado's report failed to mention whether he had reviewed the bar's security videotape, talked to defendant's family, or talked to the people who defendant associated with in the bar that night.

The prosecution argued that based on defendant's initial reliance on the identity defense, Hurtado's failure to testify about defendant's alleged gang status "did not create incurable prejudice" to the defendant, and the court properly denied his motion for mistrial. The prosecution conceded that defendant testified at trial and raised the heat of passion defense, but argued that Hurtado only would have testified about "an issue that the People did not need to prove in order to satisfy the elements" of the gang enhancement – whether defendant was a member of the Nortenos.

The prosecution separately argued that defendant was not denied his constitutional right to a fair trial because defendant failed to demonstrate how Hurtado's anticipated testimony would have provided a meritorious defense. Defense counsel was not prejudicially ineffective because of the breakdown in communications with Hurtado. Since Hurtado failed to appear at the hearing, "there is no evidence before the court or in the record that he would have qualified as a gang expert." Hurtado's e-mail to defense counsel also raised "serious bias issues" about Hurtado's attitude toward law enforcement, which the prosecutor would have addressed during cross-examination.

---

[27] The prosecution's opposition sets forth an incorrect timeline of the trial and the court's rulings on defendant's motions in limine, compared to the minute orders.

36.

As for defense counsel's alleged failure to seek a continuance, the prosecution asserted that this option was explored on the afternoon of Monday, December 13, 2010, after the court denied defendant's motion for mistrial. "The defendant was given an option of a short continuance in order to secure another gang expert," but defense counsel "elected not to explore this option as there would not be enough time."

**Defendant's response to the prosecution's opposition**

On February 1, 2011, defendant filed a response to the opposition, and asserted that Hurtado had previously qualified as a gang expert in Tulare County, and there was "little doubt" he would have qualified in this case.

Defendant conceded the trial court offered "a short continuance" after Hurtado quit, but it would not have given defense counsel sufficient time to obtain an alternate gang expert who could have reviewed discovery and prepared for trial. "Had the defendant allowed an unprepared gang expert to testify during the trial, this would have ultimately worked to his disadvantage."

**The court's denial of defendant's new trial motion**

On February 25, 2011, the court denied defendant's motion for new trial and made lengthy findings. The court acknowledged that defendant admitted that he stabbed the victim, but the jury was faced with two issues: whether the offense was attempted murder or attempted voluntary manslaughter; and the truth of the gang enhancement.

The court found the bar's security videotape was the "key" piece of evidence because it showed the events before and during the stabbing, and Officer Carsten's testimony was not "given in a vacuum." The court noted the videotape showed that defendant entered the bar with Tommy Madrid, a Norteno "shot caller," and that defendant greeted other Nortenos, including Mike Ruiz and Gilbert Salazar. Other witnesses established that Gallegos, the victim, was a Sureno, and he was showing tattoos and flashing a blue bandana.

"It is also clear from the video that the defendant and the other alleged Nortenos were posting up and around on the victim. While so posted, the defendant went to the victim without hesitation and stabbed the victim in the neck three to four times. The defendant fled out the door and the other individuals that defendant was communicating with melted back into the crowd.

"A review of the report provided by Mr. Hurtado establishes essentially everything that Officer Carsten testified to."

The court noted that defendant testified he was not a gang member, his tattoos were not gang related, and gang paraphernalia had not been found at his house. However, defendant admitted he kept guns at his house because of gang tensions, he had been stopped with other Nortenos while wearing an "N" belt buckle, and he admitted that he was housed with northerners because he felt safe around them. As for defendant's tattoos, Officer Carsten testified the star and state tattoos were often worn by Norteno gang members, although it was also established "that it could mean something completely different."

"It is clear that … Mr. Hurtado … was prepared to testify to all the things that Officer Carsten testified to, but he was also going to state that there was no evidence the defendant was or is a Norteno gang member."[28]

The court believed that based on Hurtado's statements in his report and the e-mail to defense counsel, that Hurtado appeared to be "a very angry man. He's angry with the system. And he's angry with [defense counsel] in particular. He feels that he was not treated fairly and that these gang cases unfairly single out Latinos by law enforcement for prosecution." Hurtado also complained in his e-mail about being accused of something by the prosecutor. However, the court stated that it had not heard any accusations against Hurtado "during this trial that related to this instant case and … officers."

---

[28] Hurtado's belated discovery report, which defendant filed in support of his new trial motion, was limited to the contested issue of the gang enhancement and did not address the substantive charge of attempted murder or defendant's possible motive for the stabbing.

The court believed that Hurtado had "an inflated [view] of his report and his ability to effect the outcome of this instant case simply is not supported by his report." (RT 707-708) Hurtado's e-mail referred to his " 'awesome report' " and accused the prosecutor of trying to get him off the case.

> "Quite simply, the issue boils down to whether there is even a reasonable likelihood that the outcome would have been different had Mr. Hurtado *or any expert* been there to testify regarding the nature of the assault on the victim. No special expertise is required to evaluate the video and determine what the motivation in the attack was. A lay person without any gang expertise can watch the video and determine whether this assault was a coordinated attack by the defendant and other individuals who were validated Norteno gang members. *The gang expert could not render any opinion about what was happening in the video other than speculation based on what the video shows. That's essentially what Officer Carsten testified to.* Officer Carsten could not testify that this was absolutely a gang – gang attack. It appeared to him that it was a gang attack. It appeared to him that it was a gang attack. *And taking in all the evidence and all the other materials, it appeared to him that [in] his opinion it was a gang attack. But, again, that's really up to the jurors to make that decision. And the jurors can make that decision by looking at the video and listening to the testimony.* But to me, the persuasive evidence is the jury.

> "And [defense counsel] argued all of those issues before the jury. *He got most of what Mr. Hurtado was going to testify to out of Officer Carsten. The jury just didn't buy it.*" (Italics added.)

The court also found that defense counsel was not prejudicially ineffective because "it's not reasonable to believe that another outcome would have occurred had the defense called Mr. Hurtado or any other gang expert."

> "The video speaks for itself. And a gang expert may have speculated that it could have been heat of passion. It could have been. Or as Officer Carsten testified to in his opinion it appeared to be a gang case. And that would be speculation on both sides. And that's the ultimate decision of fact that the jury has to reach.

> "They reached that decision of fact. Took them an hour to reach their verdict.

"And I'm going to deny the motion for a new trial. I don't believe there is a reasonable probability or possibility that the verdict would have been different."

## DISCUSSION

## I. Denial of defendant's motions for new trial; legal error

Based on the procedural history set forth *ante*, defendant contends the court abused its discretion when it denied his motion for new trial based on the resignation of the defense expert, Hurtado. Defendant argues the court should have granted a new trial based on an alleged error of law when it denied his motion for mistrial, and for the ineffective assistance of his defense counsel which led to the resignation of his defense gang expert.

Defendant contends the court's denial of his new trial motion resulted in the violation of his constitutional rights to due process, a fair trial, and effective assistance of counsel. Defendant further argues that the constitutional violations were prejudicial because the jury only heard testimony from the prosecution's expert, Officer Carsten, about his interpretation of defendant's possible gang status and defendant's conduct as depicted on the surveillance videotape. Defendant asserts that the court's refusal to grant a mistrial or a continuance prevented the jury from hearing the contrary opinions from a defense gang expert that the evidence showed he attacked Gallegos because of his anger about Echavarria and his heat of passion; he did not intend to murder Gallegos; he was not a member of the Nortenos; he did not discuss the stabbing with other Norteno members at the bar; and he did not commit the stabbing to benefit the Nortenos.

In this section, we will review whether the court properly denied defendant's motion for a new trial based on the allegation that the court committed an error of law when it denied his motion for mistrial. In issue II, we will review the court's denial of defendant's new trial motion based on the alleged violation of his right to effective assistance of counsel.

40.

**A.  Motion for new trial**

A motion for new trial may be granted when the court has "erred in the decision of any question of law arising during the course of the trial .…" (§ 1181, subd. 5.)  "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.  [Citation.]"  (*People v. Hayes* (1999) 21 Cal.4th 1211, 1260-1261.)  This standard of review is deferential but "it is not empty ....  [I]t asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]."  (*People v. Williams* (1998) 17 Cal.4th 148, 162.)

**B.  The court's denial of defendant's motion for mistrial**

Defendant contends the court should have granted his posttrial motion for new trial because it committed an error of law when it denied his midtrial motion for mistrial. We must thus review the court's denial of his motion for mistrial.

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged,…" (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)  "Whether a particular incident is incurably prejudicial requires a nuanced, fact-based analysis.  The trial court is entrusted with broad discretion in ruling on mistrial motions.  [Citation.]"  (*People v. Chatman* (2006) 38 Cal.4th 344, 369-370.)

"We review a trial court's order denying a motion for mistrial under the deferential abuse of discretion standard.  [Citation.]  'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'  [Citation.]"  (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094 (*Dunn*).)

**C.  *Carrillo***

In the instant case, defendant brought a motion for mistrial while the prosecution was presenting its case, and immediately upon notifying the court that Hurtado, the

defense expert, had resigned and would not appear at trial. Defense counsel argued the court should grant a mistrial because defendant could not receive a fair trial without the testimony of a defense expert. The trial court denied the motion based on *Carrillo v. Superior Court*, *supra*, 145 Cal.App.4th 1511, stating that *Carrillo* held that it was " 'an extremely rare event' " to grant a mistrial because of the perceived ineffectiveness of defense counsel, and that " 'a far safer practice' " was for the court to intervene " 'only in ruling on posttrial motions following a conviction, if indeed a conviction occurs. It is unwise for a judge to declare a mistrial due to counsel's alleged ineffectiveness because it's a chancy business to predict a verdict a jury may have returned in this case.' " (RT 338-339)

The trial court's reliance on *Carrillo* in this case was misplaced. *Carrillo* involved a complex situation triggered by a trial court's decision to grant a mistrial on its own motion, and without the defendant's consent, based on its belief that the defense counsel in that case was prejudicially ineffective because he allowed the jury to hear evidence about a coerced confession. The trial court discharged the jury without the defendant's consent, and over defense counsel's repeated objections that he had valid tactical reasons for his trial strategy. When the prosecution tried to retry the defendant, he argued that principles of double jeopardy barred retrial because the court discharged the jury without his consent. (*Carrillo*, *supra*, 145 Cal.App.4th at pp. 1520-1522, 1524, 1528.)

*Carrillo* agreed and held that in such circumstances, a defendant could not be retried if he did not consent to the mistrial and the discharge of the jury, unless the trial court's decision had been based on "legal necessity." (*Carrillo*, *supra*, 145 Cal.App.4th at pp. 1523-1524.) *Carrillo* focused on three cases which "held that ineffective assistance of counsel may, *in extreme circumstances*, constitute legal necessity for a mistrial. (*People v. Manson* (1976) 61 Cal.App.3d 102 …; *People v. McNally* (1980) 107 Cal.App.3d 387 …; *People v. Coleman* (1992) 9 Cal.App.4th 493 .…)" (*Carrillo*, *supra*, 145 Cal.App.4th at p. 1525, italics added.)

42.

"*Where, as here, a trial court becomes convinced that defense tactics are denying a defendant a fair trial, the proper course of action, in the absence of the type of extreme circumstances described in Manson, McNally and Coleman, is to allow the case to proceed to judgment and then consider whether the defendant is entitled to a new trial.* [Citations.] This is what should have occurred in this case. Once [defense counsel] became aware of the trial court's willingness to declare a mistrial, the decision as to the extent of the prejudice allegedly caused by [defense counsel's] decision to introduce [defendant's] confession was for [defendant] and his counsel. [Citation.] The trial court's decision to declare a mistrial stripped [defendant] of his right to maintain primary control over his trial and may well have compromised his effort to prove his innocence." (*Carrillo*, *supra*, 145 Cal.App.4th at p. 1529, italics added.)[29]

*Carrillo* concluded that there was no "legal necessity" for the trial court's sua sponte declaration of a mistrial and discharge of the jury without the defendant's consent and, as a result, the defendant could not be retried. (*Carrillo*, *supra*, 145 Cal.App.4th at p. 1529.)

### 1. *Analysis*

As applied to the instant case, the trial court improperly relied on *Carrillo* when it denied defendant's motion for mistrial and held that the matter should be deferred until after the verdict. *Carrillo* did not hold that a trial court could never grant a motion for mistrial based on ineffective assistance in the absence of "legal necessity" or "extreme circumstances," or that such motions should always be deferred until the conclusion of the trial. (*Carrillo*, *supra*, 145 Cal.App.4th at p. 1529.) Instead, *Carrillo* addressed a far more complex situation involving the definition of legal necessity for granting a mistrial

---

[29] In the instant case, the trial court read this language into the record as justification for the denial of defendant's motion for mistrial. The trial court in this case also cited additional language from *State v. Harrison* (Iowa 1998) 578 N.W.2d 234, 239, a case relied on by *Carrillo*, which held that a trial court's sua sponte declaration of a mistrial because of perceived inadequacy of defense counsel should be "an extremely rare event. Even where an inadequacy exists, *a far safer practice would be for the court to intervene only in ruling on posttrial motions following a conviction – if indeed a conviction occurs.* [Citation.]" (*Ibid.*, italics added; *Carrillo*, *supra*, 145 Cal.App.4th at p. 1529.)

motion and discharging the jury without a defendant's consent, and whether such orders implicated principles of double jeopardy and barred retrial. *Carrillo* was particularly critical of the trial court's failure in that case to realize that defense counsel's tactical decision about the coerced confession would not have constituted ineffective assistance if the defendant expressly agreed with the decision, the court's failure to determine whether the defendant and defense counsel had discussed this strategic decision, and whether the defendant expressly waived his right to exclude the coerced confession. (*Ibid*.)

In contrast to *Carrillo*, defense counsel in this case *expressly moved for a mistrial* based on the sudden resignation of Hurtado, the defense gang expert, in the middle of trial. If the court had granted the mistrial motion, it would have been with defendant's consent to discharge the jury, and defendant could have been retried without determining whether the mistrial motion was properly based on "legal necessity." (See, e.g., *Carrillo*, *supra*, 145 Cal.App.4th at p. 1528.) The trial court in this case incorrectly asserted that *Carrillo* limited consideration of motions for mistrial based on ineffective assistance, and the better practice was to defer the legal issues until there was a verdict.

We note that *Carrillo* criticized the trial court in that case for failing to determine whether the defendant consented to his defense attorney's tactical decisions, which would have eliminated the ineffective assistance concerns. In this case, the trial court apparently failed to evaluate whether there were any alternatives to defendant's motion for a mistrial, or whether it could address the situation without waiting for the verdict.

**D. _Dunn_**

While the court's reliance on *Carrillo* may have been misplaced, that does not mean that it necessarily abused its discretion when it denied defendant's motions for new trial and mistrial.

A situation very similar to the instant case was addressed in *Dunn*, *supra*, 205 Cal.App.4th 1086, where the trial court denied a motion for mistrial after the defense expert failed to appear. In that case, the defendant was charged with the sexual

44.

molestation of a child.  Near the end of the prosecution's case, defense counsel advised the court that his retained expert witness was unavailable to testify because of scheduling conflicts; the witness had not been subpoenaed and would not appear; and he could not find a substitute.  Defense counsel had expected the retained expert to testify about whether there was physical evidence that the defendant performed an alleged sexual act on the victim.  (*Id*. at pp. 1093-1094, 1095.)

*Dunn* extensively discussed how to review whether a mistrial should be granted "when an expert witness retained by the moving party (or any other witness expected to testify on behalf of the moving party) unexpectedly becomes unavailable or otherwise does not appear at trial." (*Dunn*, *supra*, 205 Cal.App.4th at p. 1094, fn. omitted.)  *Dunn* compared the situation to those addressed in motions for new trial, which "should be granted when necessary 'to insure an accused a fair trial.'  [Citation.]" (*Id*. at p. 1095.)

*Dunn* held the following four factors should be considered to determine whether the court should have granted the defendant's motion for mistrial based on the unavailability of the expert witness:

> "(1) [T]he defendant's diligence in securing the attendance of the witness
> [citations]; (2) the defendant's use of available alternative means to obtain
> the desired evidence [citations]; (3) the defendant's fault for the witness's
> nonappearance [citations]; and (4) the nature of the testimony expected
> from the witness and its probable effect on the outcome of the trial
> [citations]." (*Dunn*, *supra*, 205 Cal.App.4th at p. 1095.)

*Dunn* held the trial court did not abuse its discretion based on these factors.  First, while the defendant did not subpoena the expert, *Dunn* acknowledged it was not customary for a party to subpoena his own retained expert witness, and this factor was not particularly relevant to the situation. (*Dunn*, *supra*, 205 Cal.App.4th at p. 1096.)  Second, the defendant did not use "available alternative means" to obtain the expert's testimony. (*Ibid*.)  "He did not request a continuance of the trial, present a declaration from or offer to depose [the expert], or seek a stipulation from the People as to [the

expert's] credentials or the substance of her expected testimony that could be read to the jury." (*Ibid*.) *Dunn* held that the defendant's "failure to at least explore these options" supported the court's denial of his mistrial motion. (*Ibid*.)

*Dunn* held that as to the third factor, the defendant was "not entirely free from fault" regarding the expert's inability to testify. (*Dunn*, *supra*, 205 Cal.App.4th at p. 1096.)

> "… [Defense counsel] knew before trial commenced that [the expert] was scheduled to leave for vacation near the time of trial. He therefore should have communicated more effectively with her and made more definitive arrangements to secure her appearance at trial. *Although ordinarily that would not include service of a subpoena on [the expert] because she was a retained expert witness, the combination of counsel's inability to contact her during trial and her potential unavailability suggested the need for a subpoena*." (*Id*. at p. 1096.)

*Dunn* held that the fourth factor was the most important because the expert's expected testimony "would not have changed the result of the trial." (*Dunn*, *supra*, 205 Cal.App.4th at p. 1096.) The defense expert was expected to testify that there was no physical evidence that the victim's vagina was penetrated. However, *Dunn* noted that the charged offense did not require penetration of the victim's vagina. (*Id*. at pp. 1096-1098.) "Nothing in [the expert's] expected testimony could have had any impact on the controlling law the jury had to apply. [Citation.]" (*Id*. at p. 1098.)

> "Thus, because [the expert's] expected testimony concerning penetration would not have contradicted [the prosecution expert's] testimony or negated the People's legally sufficient theory of the case, [the expert's] testimony would not have affected the result of the trial, a factor further supporting the trial court's denial of [the] mistrial motion. [Citations.]" (*Ibid.*, fn. omitted.)

*Dunn* also addressed the defendant's argument that his due process rights were violated in the absence of the defense expert's testimony, because " 'the "battle of the experts" and the reasonable inferences therefrom created the realistic possibility' of a better outcome for him at trial," since the defense expert's expected opinion would have

differed from the prosecution's expert about the nature of the victim's physical injuries. (*Dunn*, *supra*, 205 Cal.App.4th at p. 1099.)  *Dunn* rejected these arguments and held there was no factual foundation to support the defendant's claim because defense counsel "conceded he had not discussed" these particular issues with the defense expert.  Defense counsel "simply advised" the court "*of his intention*" to ask the expert about this topic. (*Ibid*., italics added.)

> "In sum, all of the factors enumerated above …, except the due diligence factor to which we attribute little weight …, support the trial court's denial of [defendant's] motion for mistrial.  We therefore conclude the absence of [the defense expert's] testimony did not irreparably damage [defendant's] chances of receiving a fair trial, and the court did not abuse its discretion in denying the motion.  [Citation.]"  (*Id*. at pp. 1099-1100.)

Finally, *Dunn* concluded that even if the trial court erroneously denied defendant's motion for mistrial, based on the expert's failure to appear, the error was harmless under either *Chapman v. California* (1967) 386 U.S. 18 or *People v. Watson* (1956) 46 Cal.2d 818, because the evidence of defendant's guilt, " 'though [partially] circumstantial, was tight and strong.'  [Citation.]"  (*Dunn*, *supra*, 205 Cal.App.4th at p. 1100.)  The victim offered a detailed account of the sexual molestation, several witnesses corroborated various aspects of the sexual assault because they heard the victim tell the defendant to get off of her, the victim subsequently developed a sexually transmitted disease, and defendant tested positive for that same disease.  (*Ibid*.)

### 1. *Analysis*

We now apply *Dunn*'s analysis to the court's denial of defendant's motion for mistrial based on Hurtado's resignation as the defense expert.  Based on the first factor, defense counsel exercised diligence in this case because he retained Hurtado just after the information was filed and obtained an order for Hurtado to interview defendant in jail. As in *Dunn*, defense counsel did not subpoena Hurtado, but *Dunn* noted that it was not

customary for a party to subpoena his own witnesses. (*Dunn*, *supra*, 205 Cal.App.4th at p. 1096.)

An analysis of the second factor weighs against defendant because he did not even attempt to use available alternative means to somehow secure Hurtado's testimony. As in *Dunn*, defendant did not offer to depose the expert in order to obtain his testimony. More importantly, however, defendant did not request a continuance and refused the court's offer of a short continuance to determine whether he could convince Hurtado to return, or investigate possible alternatives to Hurtado's appearance. Defendant's failure to "at least explore these options" supported the court's denial of his mistrial motion. (*Dunn*, *supra*, 205 Cal.App.4th at p. 1096.)

An analysis of *Dunn*'s third factor – the defendant's fault for the witness's nonappearance – also weighs against defendant. As in *Dunn*, defendant was "not entirely free from fault" for Hurtado's resignation from the case. (*Dunn*, *supra*, 205 Cal.App.4th at p. 1096.) Defense counsel was aware that Hurtado had potential scheduling problems with the December trial because of his academic schedule. More importantly, defendant was aware of Hurtado's anger about various aspects of the case based on Hurtado's e-mail of December 9, 2010. Hurtado accused defense counsel of not protecting his interests. He was upset that he had to produce a written report for discovery so close to trial, that the prosecution was challenging his credibility as an expert, and that he had to appear at an evidentiary hearing for the court to determine whether he could testify as an expert.

Based on the instant record, however, the prosecution was not engaging in improper tactics when it asked the defense to comply with discovery and produce a report from the expert, or when it requested a hearing on the witness's qualifications as a potential gang expert. Indeed, defense counsel could have requested the same type of hearing or conducted voir dire on Officer Carsten's qualifications as a gang expert. (See, e.g., Evid. Code, §§ 405, 720; *People v. Watson* (2008) 43 Cal.4th 652, 692; *People v.*

48.

*Hill* (2011) 191 Cal.App.4th 1104, 1120-1123; *People v. Brown* (2001) 96 Cal.App.4th Supp. 1, 36.)  The record strongly implies that defense counsel did not explain this matter to Hurtado, or Hurtado erroneously believed that the court lacked jurisdiction to determine if he qualified as a gang expert.  Defense counsel was aware of Hurtado's reaction as of December 9, 2010, based on the e-mail that he received with the report.  The combination of counsel's conflicts with Hurtado and his potential unavailability during a December trial "suggested the need for a subpoena."  (*Dunn*, *supra*, 205 Cal.App.4th at p. 1096.)

      *Dunn*'s fourth factor as to whether the mistrial should have been granted is based on "the nature of the testimony expected from the witness and its probable effect on the outcome of the trial [citations]."  (*Dunn*, *supra*, 205 Cal.App.4th at p. 1095.)  When defendant moved for the mistrial in this case, it was difficult for the trial court to evaluate the nature of the testimony that Hurtado would have offered.  Hurtado's belated discovery report was limited to the conflicting evidence about whether defendant was a member of the Norteno gang.  Hurtado's report did not address the surveillance videotape, whether the videotape showed that defendant was in the bar with the other Norteno gang members, whether it showed that the other gang members were watching Gallegos, and whether defendant stabbed the victim because he was dancing with Echavarria.  Hurtado's report also failed to address any aspects of the charged offense of attempted murder and defendant's motive.

      Defendant argued that the trial court should grant a mistrial because there would be no defense expert to counter Officer Carsten's expert testimony.  *Dunn* rejected a similar argument that a mistrial should have been granted simply because the lack of a defense expert eliminated the possibility of a "battle of experts" and " 'the reasonable inferences therefrom created the realistic possibility' of a better outcome for him at trial," since the defense expert's expected opinion would have differed from the prosecution's expert about the nature of the victim's physical injuries in that case.  (*Dunn*, *supra*, 205

Cal.App.4th at p. 1099.)  While defendant may have planned to ask Hurtado about the videotape and other issues not included in his written report, there was no evidence that defendant discussed these particular issues with the defense expert or that the expert had reviewed the videotape, and defense counsel "simply advised" the court "*of his intention*" to ask the expert about these topics.  (*Ibid.*, italics added)

While the trial court erroneously relied on *Carrillo* when it denied defendant's motion for mistrial, it also made specific findings about the nature of defendant's case at the time of the mistrial ruling.

> "So far, the defense in this case has been 'I didn't do it.  It wasn't me.'  So far.  'No one can identify me.'  There has been attacks on the video and the credibility of whether or not somebody actually can see the defendant do what he's charged with doing.  So first off, he's claiming 'I didn't do it,' at least so far.  And let alone that, 'I'm not a gang member.'  If they find you didn't do it, whether or not there's gang testimony or not, is irrelevant.  It doesn't matter."

The court accurately summarized defense counsel's cross-examination of the prosecution's witnesses up to that point.  While defense counsel may have requested jury instructions on heat of passion, it was not clear whether defendant or any other witness was going to offer evidence to support the potential theory that the stabbing constituted an attempted voluntary manslaughter performed in the heat of passion and for personal reasons because of the victim's relationship with Echavarria, instead of an attempted murder of a Sureno, committed in a bar frequented by Nortenos, for the benefit of the Norteno gang, or even if defendant's prior relationship with Echavarria contributed to his motive to commit the offense to benefit the gang.

Based on the record before the trial court, we cannot say that it abused its discretion when it denied defendant's motion for mistrial even though it relied on an erroneous interpretation of *Carrillo*.  The court similarly did not abuse its discretion when it denied defendant's motion for new trial based on an alleged error of law when it denied his motion for mistrial.

50.

In reaching this conclusion, we are mindful that a criminal defendant has the due process right to the assistance of expert witnesses, if necessary, to prepare his defense. (*Ake v. Oklahoma* (1985) 470 U.S. 68, 83 (*Ake*); *People v. San Nicolas* (2004) 34 Cal.4th 614, 661.) "[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.…" (*Ake*, *supra*, 470 U.S. at p. 77.) The constitutional right to the effective assistance of counsel has been found to provide additional support for the entitlement to defense experts. (*People v. Stuckey* (2009) 175 Cal.App.4th 898, 917.) The California Supreme Court has held that "the right to counsel guaranteed by both the federal and state Constitutions includes, and indeed presumes, the right to effective counsel [citations], and thus also includes the right to reasonably necessary ancillary defense services. [Citations.]" (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319, fns. omitted (*Corenevsky*); *Mason v. Arizona* (9th Cir. 1974) 504 F.2d 1345, 1351.)[30]

As we have explained, however, we cannot say that the court's ruling in this case was prejudicial, based on the nature of the appellate record. The only evidence about the possible expert testimony consisted of Hurtado's rather sparse and belatedly-prepared report for discovery purposes. That report failed to address the crucial issues in this case, particularly whether the surveillance videotape showed that defendant entered the bar and associated with other Norteno members; whether they repeatedly watched the victim's conduct in the bar; and whether defendant stabbed the victim because of his alleged anger about Echavarria. Thus, given the nature of the appellate record, we cannot find that the trial court's denial of both the mistrial and new trial motions were prejudicial.

---

[30] While a criminal defendant may have the right to the appointment of an expert, as part of the right to effective assistance of counsel, a defendant does not have a federal Constitutional right to the effective assistance of an expert or any other witness. (*People v. Samayoa* (1997) 15 Cal.4th 795, 838.)

## II. **Denial of new trial motion; ineffective assistance**

Defendant also moved for a new trial based on the denial of his right to effective assistance of counsel as a result of the resignation of the defense expert. As explained above, defendant's motion for new trial was prepared by the same retained attorney who represented him during trial, and supported by that attorney's declaration, so that counsel effectively argued his own ineffective assistance during trial.

### A. **New trial/ineffective assistance**

A motion for new trial may be granted based on the nonstatutory ground of alleged ineffective assistance of counsel. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582; *People v. Reed* (2010) 183 Cal.App.4th 1137, 1143.) "Although ineffective assistance of counsel is not among the grounds enumerated for ordering a new trial under … section 1181, motions alleging ineffective assistance are permitted pursuant to 'the constitutional duty of trial courts to ensure that defendants be accorded due process of law.' [Citation.] We review such orders for an abuse of discretion. [Citation.]" (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209.)

To prevail on a claim of ineffective assistance on a motion for new trial, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient representation prejudiced the defendant, i.e., there is a "reasonable probability" that, but for counsel's failings, defendant would have obtained a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694 (*Strickland*); *People v. Andrade* (2000) 79 Cal.App.4th 651, 659-660.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694.)[31]

---

[31] While defense counsel in this case was retained, the same standard for ineffective assistance applies to both retained and appointed counsel. (*Cuyler v. Sullivan* (1980) 446 U.S. 335, 344-345; *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147.)

In many cases, however, a claim of ineffective assistance is more appropriately decided pursuant to a petition for writ of habeas corpus.  (*People v. Jones* (2003) 30 Cal.4th 1084, 1105; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

## B.  The trial court's ruling

When the court in this case denied defendant's motion for new trial, it rejected defendant's ineffective assistance arguments about Hurtado's resignation and held "it's not reasonable to believe that another outcome would have occurred had the defense called Mr. Hurtado or any other gang expert."  (RT 709)

> "No special expertise is required to evaluate the video and determine what the motivation in the attack was.  A lay person without any gang expertise can watch the video and determine whether this assault was a coordinated attack by the defendant and other individuals who were validated Norteno gang members. *The gang expert could not render any opinion about what was happening in the video other than speculation based on what the video shows.  That's essentially what Officer Carsten testified to.*  Officer Carsten could not testify that this was absolutely a gang – gang attack.  It appeared to him that it was a gang attack.  It appeared to him that it was a gang attack. *And taking in all the evidence and all the other materials, it appeared to him that [in] his opinion it was a gang attack.  But, again, that's really up to the jurors to make that decision.  And the jurors can make that decision by looking at the video and listening to the testimony.*  But to me, the persuasive evidence is the jury.

> "And [defense counsel] argued all of those issues before the jury. *He got most of what Mr. Hurtado was going to testify to out of Officer Carsten.  The jury just didn't buy it.*"  (Italics added.)

Defendant contends the court's ruling was erroneous because it failed to acknowledge that defense counsel's conflict with Hurtado, and his failure to retain another expert, allowed the jury to hear Officer Carsten's testimony as the only expert opinion on the gang issues and the interpretation of the security videotape.

## C. *Datt*

In *People v. Datt* (2010) 185 Cal.App.4th 942 (*Datt*), the court addressed a similar issue involving defense counsel's ineffectiveness and the absence of a defense expert.  In

*Datt*, officers pursued a vehicle which failed to pull over for a traffic stop. After a lengthy chase, the driver stopped the car and ran away through a residential area. About 30 minutes later, officers found the defendant hiding in a backyard. The officer who pursued the car identified the defendant as the driver who ran from the vehicle. The defendant was charged with numerous felony offenses. (*Id*. at pp. 944-946)

*Datt* rejected the defendant's contention that his trial counsel was prejudicially ineffective for failing to present expert testimony at trial on the reliability of eyewitness identification. The defendant argued an expert's testimony on this topic would have been the only way for the jury to evaluate whether the officer correctly identified him as the driver who fled from the car. (*Datt*, *supra*, 185 Cal.App.4th at p. 952.)

*Datt* held that the defendant failed to show prejudice, "that his trial counsel *could have* presented any *favorable* expert testimony. Defendant's attempt to fill this gap at the hearing on his new trial motion fell short. Defendant produced testimony that a reasonably competent attorney would have *consulted* an expert on eyewitness identification, but his witness conceded that she did not know whether defendant's trial counsel had consulted such an expert. And she admitted that the decision as to whether to call such an expert to testify at trial would have depended on whether the expert 'said they could help me.' " (*Datt*, *supra*, 185 Cal.App.4th at pp. 952-953, italics in original.) *Datt* concluded that the defendant failed to establish that his trial counsel failed to consult an expert or that such an expert would have been able to provide favorable testimony. (*Id*. at p. 953.)

### D. <u>Analysis</u>

The court denied defendant's new trial motion for defense counsel's alleged ineffective assistance significantly based on its belief that the images on the surveillance videotape could not have been explained any differently if defense counsel had called Hurtado or another defense expert. On appeal, defendant speculates that the jury was unable to clearly watch the videotape during trial and that it likely did not watch the

videotape during deliberations. However, the videotape was played for the jury during Officer Carsten's testimony, and there is no evidence that it was unable to view the tape during the trial itself.

Our review of the videotape shows defendant was in the bar with several other men, whom Officer Carsten identified as Norteno gang members – Madrid, Cervantez, and the Ruiz brothers. The men were generally dressed in black or white, with the exception of one man, identified as Bro, in a red shirt. The bar's security guard testified that Gallegos, the victim, entered the bar with a blue bandana, and displayed it two more times while he was there. However, Carsten never testified that the videotape showed the victim displaying the bandana, and it was not clear whether the victim's head tattoos were visible to defendant and his presumed associates. There is no evidence that gang slurs or slogans were shouted before, during, or after the stabbing. While defendant's associates assumed various strategic vantage points on and around the dance floor, they did not surround or restrain the victim before or during the stabbing. The videotape seems to show that Bro was closely monitoring Gallegos's general location on the dance floor and defendant's movements around the bar, while Madrid stood off to the side and appeared to watch everyone else. The videotape showed that defendant walked up and stabbed the victim in the back, by himself and without assistance, and then he ran away by himself. His associates resumed their positions in the bar, and they were still there when the police arrived.

The court denied the new trial motion and held it was up to the jury to determine whether the stabbing was gang-related, that Officer Carsten only offered his opinion and speculation about what was depicted on the videotape, and "the jurors can make that decision by looking at the video and listening to the testimony." In making this ruling, however, the court ignored the possibility that while a defense expert would have likely addressed the same factual issues discussed by Carsten, an expert might have offered different opinions from the facts and circumstances of the stabbing.

The record in this case raises several concerns about defense counsel's conduct after Hurtado resigned, particularly his failure to request a continuance or accept the court's offer of a "short" continuance. However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and in many cases, an ineffective assistance claim may be disposed of "on the ground of lack of sufficient prejudice." (*Strickland, supra*, 466 U.S. at p. 697.) Defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel. [Citation.]" (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

Even if defense counsel was ineffective for failing to take various steps after Hurtado resigned, we cannot conclude that defendant was prejudiced or that the testimony of any other gang expert would have affected the verdict, based on the appellate record before this court. While defendant's motion for new trial alleged ineffective assistance, his motion was not supported by any declarations or exhibits that would have demonstrated the possible prejudice from defense counsel's failure to make any attempt to secure another expert during trial. Defendant failed to establish trial counsel could have presented a defense expert who would have provided favorable testimony to refute Officer Carsten's opinions about the crucial aspects of the stabbing, or that the offer of a short continuance was inadequate. It would be "simply speculation" to find a reasonable probability that the defendant would have obtained a more favorable result. (*People v. Williams*, *supra*, 44 Cal.3d at p. 937.)

III. **Allegations of juror inattentiveness**

Defendant contends the court failed to conduct an adequate inquiry into allegations that a juror fell asleep during the trial, and his conviction must be reversed because it is impossible to determine from the record whether the jury heard the disputed testimony.

## A. Background

On December 9, 2010, defendant's jury trial began with opening statements and the prosecution case. Toward the end of the afternoon, defense counsel was cross-examining Shon Kekauoha, the bar's security guard, about his review of the photographic lineup. The court interrupted the examination and had the following exchange with someone in the courtroom:

> "THE COURT: Excuse me. Is there something going on out there?
>
> "AUDIENCE: The juror was falling asleep.
>
> "THE COURT: Which juror?
>
> "AUDIENCE: The young lady in the black, the third one.
>
> "THE COURT: You know, if you feel yourself dozing a little bit or nodding off, let me know. We'll stand up. Sometimes it can get kind of warm in here.
>
> "A JUROR: She's right.
>
> "THE COURT: If you have a problem, talk to the bailiff. Don't be chitchatting back and forth, okay. Thank you.
>
> "[DEFENSE COUNSEL]: Judge, were you talking to me?
>
> "THE COURT: No. I'm talking to the people in the audience."

The court further advised the audience: "If you have an issue or if you see a problem, talk to the bailiff, and he'll take care of it." Defense counsel resumed his cross-examination of Kekauoha. Shortly afterwards, the court excused the jury for the day. The court and the parties discussed jury instructions, and the court adjourned. Defense counsel did not address the juror's status or ask the court to conduct any further inquiry.

## B. Analysis

A defendant has a constitutional right to an impartial jury is protected by the trial court's authority to replace a juror for good cause, which includes sleeping through a

57.

material portion of the trial.  (§ 1089; *People v. Bradford* (1997) 15 Cal.4th 1229, 1349 (*Bradford*); *In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

"Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged.  [Citation.]  We have recently explained, however, that the mere suggestion of juror 'inattention' does not require a formal hearing disrupting the trial of a case.  [Citation.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 821 (*Espinoza*).)

Both the scope of such inquiry and the ultimate decision whether to retain or discharge a juror are committed to the sound discretion of the trial court.  (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.)  "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 343.)  If any substantial evidence exists to support the trial court's exercise of its discretion, the court's action will be upheld on appeal.  (*Bradford, supra,* 15 Cal.4th at p. 1351.)

"The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." (*People v. Ray, supra,* 13 Cal.4th at p. 343.)  Although a juror's sleeping through a material portion of the trial may be good cause for the discharge of the juror (*People v. Bonilla, supra,* 41 Cal.4th at p. 350; *Bradford, supra,* 15 Cal.4th at pp. 1348-1349), information that amounts to no more than mere speculation that a juror is sleeping does not trigger the court's duty to investigate.  (*Espinoza, supra,* 3 Cal.4th at p. 821.)

Discharge of a juror is not required absent evidence the juror was asleep for a substantial period of material portions of the trial.  (*Bradford, supra,* 15 Cal.4th at p. 1349.)  For example, *Espinoza* held that defense counsel's speculation that a juror might have been sleeping was insufficient to apprise the trial court that good cause might

58.

exist to discharge the juror, and therefore did not obligate the court to conduct any further inquiry. (*Espinoza*, *supra*, 3 Cal.4th at p. 821.) In *People v. DeSantis* (1992) 2 Cal.4th 1198, the trial court closely observed several jurors to determine whether they were asleep, and determined that none were dozing. *DeSantis* held that the trial court's "self-directed inquiry" was sufficient, and that a more formal hearing was not required under the circumstances. (*Id*. at pp. 1233-1234.)

*Bradford* held the trial court did not abuse its discretion when it failed to conduct an inquiry into alleged juror inattentiveness, when the court and defense counsel acknowledged that a juror appeared to be asleep on parts of two days. (*Bradford*, *supra*, 15 Cal.4th at pp. 1348, 1349.) *Bradford* cited the absence of any reference in the record to the juror's inattentiveness "over a more substantial period," and defense counsel's failure to allege juror misconduct or request a hearing on the subject "further indicates that the juror's conduct had not warranted such a hearing." (*Id*. at p. 1349.)

In this case, the court did not abuse its discretion when it addressed an audience-member's allegations that a juror might have been asleep. The court immediately addressed the jurors and encouraged them to ask for a break if they felt they were "dozing a little bit or nodding off." It is noteworthy that neither the prosecutor nor defense counsel agreed with the audience-member's statements or asked the court to further investigate the matter. The court's comments indicated that it was alert to the possible risk of jurors falling asleep and properly conducted its own "self-directed inquiry." (*People v. DeSantis*, *supra*, 2 Cal.4th at pp. 1233-1234.) Based on its own observations, the court adequately responded to the comments of the anonymous member of the audience, and it was not required to further investigate based on the record before it. As in *Bradford*, defense counsel's failure to request a hearing or assert misconduct by a particular juror, at the time of this incident or later in the trial, "further indicates that the juror's conduct had not warranted such a hearing." (*Bradford*, *supra*, 15 Cal.4th at p. 1349.) We will not speculate based on the record before this court.

**IV.    Defendant's objections to Officer Carsten's expert testimony**

In our discussion of Officer Carsten's trial testimony, we noted several instances where Carsten testified to his belief about what the videotape showed, and the trial court overruled defense counsel's objections based on speculation and other grounds. Defendant contends the court abused its discretion when it overruled his objections, and that Carsten improperly testified based on pure speculation about what happened in the bar that night.

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion [citation].  Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'  [Citation.]  The subject matter of the culture and habits of criminal street gangs … meets this criterion.  [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.)

" '[T]he admissibility of expert opinion is a question of degree.  The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard.  Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury.  It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness." ' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300.)  The trial court exercises broad discretion in determining the admissibility of expert testimony, and its ruling will not be disturbed on appeal absent a manifest abuse of discretion. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1207.)

A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 949.) Expert testimony about the " 'culture and habits' " of a criminal street gang include testimony "about the size, composition or existence of a gang [citations], gang turf or territory [citations], an individual defendant's membership in, or association with, a gang [citations], the primary activities of a specific gang [citations], motivation for a particular crime, generally retaliation or intimidation [citations], whether and how a crime was committed to benefit or promote a gang [citations], rivalries between gangs [citation], gang-related tattoos, gang graffiti and hand signs [citations], and gang colors or attire [citations]." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 656-657, fns. omitted, disapproved on other grounds in *People v. Vang* (2011) 52 Cal.4th 1038, 1047-1048.)

The court did not abuse its discretion when it overruled defendant's objections to Officer Carsten's testimony about the conduct of defendant and the other men as depicted on the videotape. Carsten did not exceed the proper bounds of gang testimony by giving his opinion about a gang member's subjective knowledge and intent. (See, e.g., *People v. Killebrew*, *supra*, 103 Cal.App.4th at pp. 647, 657-659; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196, 1199.) Instead, Cartsen testified about his interpretation of the videotape, an exhibit which was played for the jury and introduced into evidence. Carsten testified that defendant was in the bar with well-recognized members of the Norteno gang, and he identified them by their names and locations in the bar – that defendant entered the bar with Tommy Madrid; the Ruiz brothers, Gilbert Salazar, and Alex Cervantez were also at the bar; defendant and these men interacted with each other, and they also interacted with the man in the red shirt, known only as Bro. Based on his examination of the videotape, Carsten also testified to his opinion that these men were talking with each other before the stabbing; and that they were posting to watch Gallegos on the dance floor, and to also watch the area around themselves. The jury was capable

of watching the videotape and determining whether defendant entered the bar with Madrid, the men were talking and associating with each other, and the men were watching Gallegos.

At one point during his testimony, Officer Carsten opined that defendant and the other men were likely talking about Gallegos. His opinion was based on his observations of the videotape, that defendant and his associates were talking with each other, and they were looking at the dance floor, in Gallegos's direction, before defendant walked behind Gallegos and stabbed him. While such testimony may have been speculative, any error in its admission is necessarily harmless given the nature of defense counsel's cross-examination. Carsten conceded that the videotape was silent and did not have an audio track, none of the witnesses in the bar testified about overhearing the conversations that occurred between defendant and the other men, and he did not know whether defendant and the other men were talking about Gallegos. However, Carsten explained that his opinion was based on his observations of the videotape, that defendant and the other men appeared to be looking toward Gallegos's direction, and they were talking about each other as they looked at him.

Officer Carsten's opinion testimony was based on his interpretation of the videotape, and did not constitute inadmissible speculation evidence. (Cf. *People v. Ramon* (2009) 175 Cal.App.4th 843, 851.)

## V.   **CALCRIM No. 1401**

Defendant was charged and convicted of attempted murder, and the jury found the gang enhancement true pursuant to section 186.22, subdivision (b). Defendant contends the gang enhancement must be stricken because the jury did not receive the complete version of CALCRIM No. 1401, which defines the elements of the gang enhancement.

Both defendant and the People agree that the court correctly read the full version of CALCRIM No. 1401 to the jury; they also agree that the printed version of CALCRIM No. 1401 omitted the definition of a gang's primary activities as certain enumerated

62.

crimes. Defendant argues the error is prejudicial and requires the gang enhancement to be stricken. The People argue the error is harmless since the court read the full instruction to the jury.

## A. **Primary activities**

Section 186.22, subdivision (f) defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated [in section 186.22, subdivision (e)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

"To trigger the gang statute's sentence-enhancement provision (§ 186.22, subd. (b)), the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322.) These enumerated offenses include assault with a deadly weapon, robbery, unlawful homicide or manslaughter, sale, possession for sale, transportation and/or manufacture of narcotics; shooting at an inhabited dwelling or occurred vehicle, grand theft, witness intimidation, burglary, and carjacking. (§ 186.22, subd. (e).)

"Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities. Both past and present offenses have some tendency in reason to show the group's primary activity [citation] and therefore fall within the general rule of admissibility [citation]." (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 323.)

## B. **The instructions**

Both defendant and the People agree that the court correctly *read* the following version of CALCRIM No. 1401 to the jury, which defined the elements of the gang enhancement:

63.

"To prove this allegation, the People must prove that: One, the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang, and; Two, the defendant intended to assist, further, or promote criminal conduct by gang members.

"A criminal street gang is any ongoing organization, association, or group of three or more persons, whether formal or informal, that has: One, a common name or common identifying sign or symbol; Two, that has, as one or more of its primary activities, the commission *of murder, attempted murder, robbery, car jacking, assault with a deadly weapon, witness intimidation, auto theft, grand theft*; Three, whose members, whether acting alone or together, engaged in or having engaged in a pattern of criminal gang activity.

"In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of a group.…" (Italics added.)

Both defendant and the People also agree that the printed instruction, contained in the clerk's transcript, completely omitted the language italicized above, which defined the gang's primary activities. The italicized language was the only part of the instruction which was omitted.

## C. Conflicts between written and oral instructions

The parties agree that the printed version of CALCRIM No. 1401 omitted the phrase which defined certain offenses as a gang's primary activities. The parties disagree about the impact of this omission.

" 'It is generally presumed that the jury was guided by the written instructions.' [Citations.] The written version of jury instructions governs any conflict with oral instructions. [Citations.] Consequently, as long as the court provides accurate written instructions to the jury to use during deliberations, no prejudicial error occurs from deviations in the oral instructions. [Citations.]" (*People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1112-1113.)

We are presented with the opposite situation: the court correctly read CALCRIM No. 1401, but the written instruction erroneously omitted the definition of a gang's

primary activities. There is no indication in the minute order that the court gave the printed instructions to the jury during deliberations, or the jury asked for the printed instructions. When the court began to read the instructions to the jury, however, it stated that it would "give you a copy of the instructions to use in the jury room."

"Although this court gives priority to the written version of an instruction when a conflict exists between the written and oral versions, the jury is not informed of this rule." (*People v. Wilson* (2008) 44 Cal.4th 758, 804.) In a criminal trial, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction ... so infected the entire trial that the resulting conviction violates due process." ' [Citations.]" (*Middleton v. McNeil* (2004) 541 U.S. 433, 437; *Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Huggins* (2006) 38 Cal.4th 175, 192.) " '[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional] right ….' " (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643, fn. omitted; *Estelle v. McGuire, supra,* 502 U.S. 62, 72.) Correct oral instructions, the jury's awareness of differences between the written and oral instructions, and the weight of evidence against the defendant are all factors considered in determining whether or not an erroneous instruction was harmless. (*People v. Wilson, supra,* 44 Cal.4th 758, 804.)

**D. Analysis**

Under the heightened constitutional standard of review, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California, supra,* 386 U.S. 18, 24.) There are several factors which demonstrate that the omission in the written instruction was harmless. The entirety of the record reflects that the existence of the Nortenos as a criminal street gang was established by overwhelming evidence, and that the defense never challenged the existence of the gang itself. Officer Carsten testified

that the Nortenos were a criminal street gang in Tulare County, they were associated with the Nuestro Familia prison gang, the gang claimed the color red and the number 14, and there were approximately 300 Nortenos in Tulare County.

Officer Carsten testified the primary activities of the Norteno street gang in Tulare County included robbery, carjacking, murder, attempted murder, auto theft, burglary, shooting at inhabited dwelling, witness intimidation, and drug transactions. Carsten had personally investigated vandalisms, robberies, burglaries, carjackings, witness intimation incidents, and auto thefts involving Nortenos. Carsten also testified about two predicate offenses committed by active members of the Nortenos in Tulare County, consisting of armed robbery, second degree murder, and voluntary manslaughter.

In closing argument, the prosecutor argued the Nortenos were a criminal street gang as required by statute, and cited Officer Carsten's testimony about the predicate offenses of murder and manslaughter committed by other members of the Nortenos. The prosecutor also cited Carsten's testimony that the primary activities of the Nortenos included "murder, attempted murder, assault with a deadly weapon, carjacking, witness intimidation. List goes on what these guys do and how random."

Defense counsel extensively cross-examination Officer Carsten about several issues, but he did not challenge Carsten's testimony about the very existence of the Nortenos as a criminal street gang in Tulare County. In his closing argument, defense counsel did not challenge the premise that the Nortenos were a criminal street gang, but pointed out that there was no evidence that defendant committed any of the predicate offenses or any other gang-related crimes.

Finally, the jury heard the full and correct version of CALCRIM No. 1401 when the court read the instructions. As we have already noted, while the court "gives priority to the written version of an instruction when a conflict exists between the written and oral versions, the jury is not informed of this rule. It is thus possible the jury followed the oral instruction." (*People v. Wilson, supra*, 44 Cal.4th at p. 804.) Even if the jury received

66.

the written instructions, there is no indication that it was aware of the difference between the oral and written versions of CALCRIM No. 1401 since it did not ask any questions on this point. (*People v. Wilson*, *supra*, at p. 804.)

Based on these circumstances, we find the omission of the primary activities definition in the written version of CALCRIM No. 1401 was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at pp. 23-24; *People v. Wilson*, *supra*, 44 Cal.4th at p. 804.)

## VI.   CALCRIM No. 1403

Defendant raises two challenges to CALCRIM No. 1403 regarding the limited purpose of gang evidence. First, he argues the court misread an introductory phrase in the instruction's first paragraph, which allegedly led the jury to believe that it had a mandatory duty to rely on the gang evidence for certain purposes.

Second, defendant contends the court selected the wrong optional language and improperly used the phrase "gang-related crime" instead of "gang-related enhancement" when it read the instruction to the jury.

### A.  Limited admissibility of gang evidence

We begin with the limited admissibility of gang evidence. "California courts have long recognized the potential prejudicial effect of gang evidence. As a result, our Supreme Court has condemned the introduction of such evidence 'if only tangentially relevant, given its highly inflammatory impact.' [Citations.] Because gang evidence creates a risk that the jury will infer that the defendant has a criminal disposition and is therefore guilty of the charged offense, 'trial courts should carefully scrutinize such evidence before admitting it.' [Citation.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 (*Samaniego*).)

"Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" (*People v. Sanchez* (1997) 58

Cal.App.4th 1435, 1449.) "Nonetheless, evidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative. [Citations.]" (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1167.)

"*Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related*. [Citation.] ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' [Citations.] Gang evidence is also relevant on the issue of a witness's credibility. [Citations.]" (*Samaniego*, *supra*, 172 Cal.App.4th at pp. 1167-1168, italics added.)

CALCRIM No. 1403 is the appropriate instruction on the limited admissibility of gang evidence. The court does not have a sua sponte to give the limiting instruction, but it must be given when requested by a party and supported by the evidence. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052.) CALCRIM No. 1403 is "neither contrary to the law nor misleading. It states in no uncertain terms that gang evidence is not admissible to show that the defendant is a bad person or has a criminal propensity. It allows such evidence to be considered only on the issues germane to the gang enhancement, the motive for the crime and the credibility of witnesses." (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1168.)

CALCRIM No. 1403 is not limited to only being given in cases where a defendant has been charged with either the gang substantive offense pursuant to section 186.22, subdivision (a), or the gang enhancement pursuant to section 186.22, subdivision (b). In cases not involving section 186.22, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation … can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.

68.

[Citations.]"  (*People v. Hernandez, supra,* 33 Cal.4th 1040, 1049.)  As explained in *Samaniego*, CALCRIM No. 1403 is relevant and appropriate in such cases when gang evidence is introduced regarding a defendant's "motive and credibility."  (*Samaniego, supra,* 172 Cal.App.4th at pp.1168-1169.)

### B. Mandatory/permissive language

With this background in mind, defendant contends the court erroneously used mandatory language when it read the first paragraph of CALCRIM No. 1403 to the jury.

As given in this case, the written version of CALCRIM No. 1403 was consistent with the pattern instruction and contained the permissive language of "may" or "may not," as italicized below:

> *"You may consider* evidence of gang activity only for the limited purpose of deciding whether:
>
> "The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime and enhancements charged;
>
> "OR
>
> "The defendant had a motive to commit the crime charged.
>
> *"You may also conside*r this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion
>
> *"You may not consider* this evidence for any other purpose.  *You may not conclude* from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."  (Italics added.)

As the parties agree, the court read the following version of the first paragraph of CALCRIM No. 1403:

> *"You must consider or you may consider* evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime and enhancements charged or the defendant had a motive to commit the crime charged."  (Italics added.)

As illustrated *ante*, when the court *read* the first sentence of the first paragraph of CALCRIM No. 1403, it initially and erroneously said that the jury "must consider." However, the court immediately corrected itself and said in that same sentence that the jury "may consider" the gang evidence for limited purposes. The parties agree that the court correctly read the rest of the instruction, using the permissive "may" or "may not" as required by the pattern instruction, and it did not repeat the error.

Defendant now contends that the court's erroneous use of the phrase "must consider" in the first sentence of the first paragraph of CALCRIM No. 1403 was prejudicial. Defendant argues that when the court used the mandatory word "must," the jury likely believed that it was required to rely on the gang evidence.

Defendant's argument is meritless. First, while defendant requested CALCRIM No. 1403, he did not object to the court's use of "must" instead of "may." Having failed to do so, he has forfeited review of the issue. (*Hernandez*, *supra*, 33 Cal.4th at p. 1051.)

Second, it is not reasonably likely the jury interpreted the instruction in the manner suggested by defendant because the court immediately corrected the mistake before it even completed the sentence. "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.…" (*Middleton*, *supra*, 541 U.S. at p. 437.) The trial court's misstatement was brief and promptly corrected, and it is not reasonably likely that the jury misunderstood or misapplied the instruction given the court's immediate correction of its momentary mistake. (*People v. Smithey* (1999) 20 Cal.4th 936, 963; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1060, reversed on other grounds in *Stansbury v. California* (1994) 511 U.S. 318.) The court correctly read the rest of the instruction using the permissive "may," the jury received the correct written instruction, and the jury was not faced with the task of attempting to resolve a conflict between the oral and written versions. "[M]isreading instructions is at most harmless error when the written instructions received by the jury are correct." (*People v. Box* (2000) 23 Cal.4th 1153, 1212.)

## C. **"Gang-related" offense**

Defendant raises a second issue about CALCRIM No. 1403, based on the court's selection of certain optional language in the first paragraph, as provided by the pattern instruction. The pattern instruction for CALCRIM No. 1403 offers the following options for the first paragraph, as italicized below:

> "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] [The defendant acted with the intent, purpose, and knowledge that are required to prove the *gang-related (crime[s]/ [and] enhancement[s]/ [and] special circumstance allegations) charged*(;/.)] .…" (Italics added.)

As set forth *ante*, the court read the first paragraph of CALCRIM No. 1403 to the jury as follows:

> "You must consider or you may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove *the gang-related crime and enhancements charged* or the defendant had a motive to commit the crime charged." (Italics added.)[32]

Defendant cites to the phrase "the gang-related crime," as italicized *ante*, and argues the court erroneously used this phrase when it read CALCRIM No. 1403 to the jury in this case. Defendant notes that the disputed issue was whether the charged substantive offense of attempted murder was a gang-related crime. Defendant argues that when the court used the phrase "gang-related crime" in CALCRIM No. 1403's first paragraph, it essentially directed the jury to find that the charged offense of attempted murder *was* a gang-related crime, and that the jury did not have to address or consider that disputed issue.

---

[32] In contrast to the other instructional issues raised in this case, the jury received the identical language about the "gang-related crime" in both the written and verbal versions of the CALCRIM No. 1403.

71.

Defendant asserts that the phrase "gang-related crime" should only be used when a party is charged with the gang substantive offense pursuant to section 186.22, subdivision (a), which was not alleged in this case. Defendant further asserts that the court should have instructed the jury that it could consider the gang evidence for the proof of the gang-related *enhancement*, which would have accurately described the charges in this case.

As with his other instructional issues, defendant did not object to the version of CALCRIM No. 1403 given by the court or ask the court to modify the instructional language. (*Hernandez*, *supra*, 33 Cal.4th at p. 1051.) "Generally, ' "[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." ' [Citations.]" (*Samaniego, supra,* 172 Cal.App.4th at p. 1163.) Having failed to do so, he has forfeited review of this issue.

In any event, we find it is not reasonably likely the jury interpreted the instruction in the manner suggested by defendant. "Motive is always relevant in a criminal prosecution." (*People v. Perez* (1974) 42 Cal.App.3d 760, 767.) Gang evidence is relevant and admissible "*when the very reason for the underlying crime, that is the motive, is gang related.* [Citation.]" (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1167, italics added.) Aside from allegations of the gang enhancement, evidence of a defendant's gang membership and activity may be separately relevant to his motive and intent for committing the charged substantive offense against a rival or suspected rival (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1517-1519; *People v. Williams* (1997) 16 Cal.4th 153, 193-194); or when criminal activity has been preceded by gang signs or identification (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1222, 1224).

In this case, the court properly admitted the gang evidence as relevant and probative for the section 186.22, subdivision (b) gang enhancement, and also for defendant's motive and intent to commit the charged offense of attempted murder. The prosecution's theory of the case was that defendant was guilty of attempted murder and

72.

not some lesser offense, based on evidence that defendant was a Norteno, he was at the bar with other Nortenos, they saw Gallegos enter the bar, Gallegos showed the blue bandana and had Sureno tattoos, and defendant attempted to murder Gallegos because of the gang rivalry and to gain respect from the Nortenos. While defendant admitted that he stabbed Gallegos, he testified that he was upset because of his prior relationship with Echavarria, he knew he was too intoxicated to fight with Gallegos, and he decided to stab him instead. Defense counsel argued that defendant was not guilty of attempted murder but might be guilty of attempted voluntary manslaughter because he acted in the heat of passion, while he was drunk, when he saw Echavarria with Gallegos.

The gang evidence was thus relevant to establish defendant's motive and intent to murder Gallegos because of the Norteno/Sureno gang rivalry, and not because he was upset that Gallegos was there with a former girlfriend. The gang evidence was also relevant and admissible to prove the elements of the gang enhancement. Given the dual relevancy of the evidence, the court did not commit error when it instructed the jury that it could consider the gang evidence to determine whether defendant committed "the gang-related crime and enhancements charged or the defendant had a motive to commit the crime charged."

## VII.   Prosecutorial misconduct/closing argument

In the course of his testimony, Officer Carsten testified about two predicate offenses committed by members of the Norteno gang in Tulare County. One of these offenses involved a homicide committed by Norteno gang members Javier Solis and Richard Contreras on May 7, 2007. Defendant was not involved in either of the predicate offenses.

Defendant contends the prosecutor committed prejudicial misconduct during closing argument because he discussed detailed facts about Solis/Contreras case which Officer Carsten had not testified about. Defendant argues the prosecutor's reference to facts not in evidence was prejudicial because he addressed a particularly violent and

73.

random crime committed by the Norteno gang, which could have been compared with the stabbing in this case. Defendant acknowledges his defense counsel did not object to the alleged misconduct, and alternatively argues defense counsel was prejudicially ineffective for failing to object.

## A. Prosecutorial misconduct/ineffective assistance

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.) "When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.]" (*Id*. at pp. 1202-1203.)

A prosecutor commits misconduct if he or she mischaracterizes or misstates the evidence, or refers to facts not in evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 823, 827-828, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Benson* (1990) 52 Cal.3d 754, 794-795.)

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 841.)

Defendant concedes that defense counsel did not object to any of his alleged appellate claims of prosecutorial misconduct. In the alternative, defendant argues that his attorney was prejudicially ineffective for failing to object. "To establish ineffective

assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms.  Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him. [Citations.]"  (*People v. Hawkins* (1995) 10 Cal.4th 920, 940, overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 and *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)

**B.  Trial evidence about predicate offenses**

We begin with Officer Carsten's testimony about the Contreras/Solis homicide case as one of the predicate offenses required to prove the Nortenos were a criminal street gang in Tulare County.

> "The victim in this case was walking on North Highland Street in the City of Visalia.  He was with another male friend and a female.  They were walking on North Highland when they were contacted by three individuals. These three individual were Richard Contreras, Javier Solis, and Daniel Contreras.  The … two Contreras and the Solis males, they stopped when they meet these three walking down the road.  One of the Contreras or Solis was on a bike.  The other two were on foot.  They stop when they meet these other three and ask them if they know where they are, and 'Did you know that you're on our block?'  And the victims at that point were attacked.  … Eric Villagomez, was knocked down and beaten as was the victim, Matthew Main.  Richard Contreras stabbed Matthew Main during this fight.  Villagomez was also stabbed in the arm.  Matthew Main died from his injuries."

Officer Carsten testified that Solis and Richard Contreras were active members of the Norteno gang when they committed the offenses.  Carsten also testified to his opinion that the offenses were "representative of the primary activities of the Norteno street gang."

The prosecution introduced certified copies of documents from the Contreras/Solis case.  These documents included the information, which alleged jointly charged Contreras and Solis with murder of Main, with a gang special circumstance, and the

75.

substantive gang offense; Contreras was separately charged with attempted murder of Villagomez; and Solis was separately charged with assault with a deadly weapon, a knife, on Villagomez. The information also alleged gang and personal use (knife) enhancements.

The certified documents also showed that Contreras pleaded guilty to second degree murder of Main, attempted murder of Villagomez, admitted to gang and weapon (knife) enhancements, and was sentenced to 23 years to life. Solis pleaded guilty to voluntary manslaughter of Main, assault with a deadly weapon of Villagomez, admitted gang, weapon (knife) and great bodily injury enhancements, and was sentenced to 25 years to life.

## C. Closing argument

The abstract of judgments and minute orders state that Jason Liandes, the prosecutor in this case, was also the prosecutor when Contreras and Solis entered their pleas. In his closing argument in this case, Liandes addressed the Contreras/Solis predicate offense:

> "You have Javier Solis and Richard Contreras. In that case, that was a murder case. A victim by the name of Matthew Main was walking down the street with Eric Villagomez and Erica Enos. They were walking towards Houston Street when three Nortenos, all juveniles, approached from the opposite direction on the opposite side of the street. One of them from the Norteno group said, 'What are you doing on our block?' These three victims just, 'I don't know.' How do you respond to that? Just kind of laughed. All right. Just kind of laughed. Laughed it off.

> "Richard Contreras' little brother, Daniel Contreras, and Javier Solis were all part of this Norteno group. Richard Contreras was on a bicycle. These three people, Erica, Eric, and Matthew left Erica Enos' house. They were about a block away from their house. All right.

> "Richard Contreras on the bicycle circles back around, rolls up next to Eric Villagomez, flips out a knife, jumps off the bike, and immediately attacks Eric Villagomez. The other two, Javier and his little brother Daniel, joined in the attack.

76.

"Eric Villagomez gets down on his knees and like a fetal protection to protect his head where the knife comes right in his shoulder as he's protecting his head.

"At this time, Matthew Main, just outside of high school, goes over to protect Eric Villagomez. The three then turn their attention on him. And Richard Contreras stabs Matthew Main three times and lays bleeding in the street. And as the three of them take off, they yell 'Norte. This is our street.' That's the group that this person belongs to.

"And is this crime any different? These are the primary activities of the Norteno street gang.

"And you can look at their convictions, Javier Solis and Richard Contreras. Richard Contreras pled out to second degree murder and attempted murder on Eric Villagomez. That random encounter, is that really anything different than this? Is that anything different than this?"

Defense counsel briefly referred to the Contreras/Solis case in his closing argument, and said that it was a foundational crime "to show that this is gang-related," and that Solis was "found guilty" of voluntary manslaughter."

In rebuttal argument, the prosecutor explained the prior offenses were introduced to "show that the members of the Norteno gang do these primary type activities." The prosecutor also pointed out that he was the prosecutor in the Contreras/Solis case and, contrary to defense counsel's statement, Contreras and Solis were not convicted after a jury trial but they entered pleas, as indicated in the certified documents.

**D. Analysis**

Defendant never objected to the prosecutor's discussion of the Solis/Contreras case during closing argument and has waived any prosecutorial misconduct claims. However, he argues defense counsel was prejudicially ineffective for failing to object. In making this ineffective assistance argument, however, defendant has failed to show the requisite prejudice.

The majority of the prosecutor's discussion about the Contreras/Solis case was based on facts which were introduced before the jury, either through Officer Carsten's

77.

testimony or the documentary exhibits. The prosecutor briefly strayed from Carsten's testimony, however, when he mentioned that Contreras rode his bicycle around the victims; that he jumped off the bicycle to stab Villagomez; that Solis and Daniel Contreras joined in the attack; that Villagomez went into the fetal position to protect his head while the knife came into his shoulder; that Main tried to protect Villagomez; and that Richard Contreras stabbed Main three times.

However, these facts were peripheral to the contested issues in this case – whether defendant attempted to murder Gallegos for the benefit of the Nortenos. Defense counsel never challenged the evidence in support of the predicate offenses, except to clarify that defendant was not involved in either offense. The prosecutor's limited discussion of facts not in evidence did not raise the inference that defendant was involved in the Solis/Contreras case. Defense counsel's failure to object was not prejudicial because defendant never challenged the underlying facts for the predicate offense or the evidentiary issue as to whether the Nortenos were a criminal street gang.

## DISPOSITION

The judgment is affirmed.

_____
Poochigian, Acting P.J.

WE CONCUR:


_____
Detjen, J.


_____
Franson, J.

78.